UNITED STATES of America and W. Donald Bell, Special Assistant, Internal Revenue Service, Appellees,

v.

The EQUITABLE TRUST COMPANY, Defendant,

and

Victor DiVivo, Appellant.

No. 78–1903.

United States Court of Appeals, Fourth Circuit.

Argued March 14, 1979.

Decided Oct. 16, 1979.

Kenneth A. Reich, Baltimore, Md. (Allen L. Schwait, Garbis & Schwait, P. A., Baltimore, Md., on brief), for appellant.

Daniel F. Ross, Tax Div., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Charles E. Brookhart, Tax Div., Dept. of Justice, Washington, D. C., Russell T. Baker, Jr., U. S. Atty., John F. Hyland, Jr., Asst. U. S. Atty., Baltimore, Md., on brief), for appellees.

Before WINTER and HALL, Circuit Judges, and KAUFMAN *, District Judge.

KAUFMAN, District Judge.

This case involves an administrative summons issued by the Internal Revenue Service (IRS) pursuant to 26 U.S.C. § 7602 to

* Honorable Frank A. Kaufman, United States District Court for the District of Maryland, sitting by designation.

require the Equitable Trust Company (Equitable), a Baltimore banking institution, to provide all records held by the latter relating to a mortgage loan made by it to DiVivo, Intervenor herein, and DiVivo's business associate, DiBiasi, in their capacities as individuals trading as Italian Delight Restaurant. The summons is sought in furtherance of a tax investigation of DiBiasi, not DiVivo, but specifically refers to "records * * * with respect to a mortgage loan made by and between Angelo DiBiasi and Victor DiVivo, T/A Italian Delight Restaurant at 115–117 East Baltimore Street and the Equitable Trust Company * * *." The facts, giving Intervenor DiVivo the benefit of all inferences which may reasonably flow from the evidence produced to date and the evidence proffered by Intervenor, are as follows:

Beginning in 1977, Intervenor became the subject of a tax investigation by the Criminal Investigation Division of the Internal Revenue Service (IRS).[1] In December 1977, DiBiasi and four other persons were directed by the IRS to appear before the IRS Special Agent in charge of the tax investigation of DiVivo to answer questions under oath relating thereto. Neither DiBiasi nor any of the others was informed that he was a target or a potential target of any IRS investigation, civil or criminal.[2] In April 1978, some four months after they were so questioned, DiBiasi and the four others were officially notified by the IRS that each was a target of a tax investigation. On April 13, 1978, the special agent assigned to the DiVivo investigation telephoned the attorney representing DiBiasi and also one or more of the other four persons. The agent suggested to that attorney that one or more of the latter's clients cooperate with the IRS in the DiVivo investigation. During that conversation the subject of immunity for those clients was discussed. The agent stated that his office within the IRS could not provide immunity to a witness, but that immunity could be secured in an appropriate case. The agent indicated that two of those whose cooperation was sought were resident aliens whose ability to remain in the United States might be adversely affected by a continuing tax investigation. The agent also mentioned that he was aware that DiBiasi had consulted DiVivo's attorney regarding representation of DiBiasi by that attorney. The agent expressed the view that representation by one attorney of both DiVivo and DiBiasi would create a conflict of interest. DiBiasi's attorney formed the impression from that telephone conversation that the IRS was attempting to pressure DiBiasi and the others to cooperate with the IRS in its investigation of DiVivo[3] and that the IRS had possessed

---

**1.** There are two principal investigative divisions within the IRS: the Audit Division and the Criminal Investigation Division. The latter was once known as the Intelligence Division. The Audit Division reviews a taxpayer's returns and recommends adjustments in tax if necessary, and is concerned only with civil adjustments and civil liability. The basic functions of the Criminal Investigation Division are to investigate taxpayers suspected of criminal violations of the tax laws and to recommend prosecution if appropriate. In many instances a Special Agent of the Criminal Investigation Division and a Revenue Agent of the Audit Division work together jointly in an investigation. The Special Agent is usually in charge of any such investigation, with the Revenue Agent assisting in determination of correct tax liability. *See* Internal Revenue Manual, § 9324.

**2.** The Internal Revenue Manual §§ 9383.1 and 9384.2 and the Special Agents Handbook § 243.2 set forth procedures to be followed by Special Agents in conducting themselves during question and answer sessions and in advising persons being questioned of their rights.

**3.** Internal Revenue Manual § 9382.2 refers to the use of "alleged improper conduct" by special agents as an arm of "defense strategy" and provides that "[i]n order that no situation may arise * * * which may furnish a factual basis for the use of such defense strategy," agents should, *inter alia*, avoid "(b) statements or questions which may be construed as offers of immunity * * *." *See also* § 9131 of the Internal Revenue Manual. Special Agents Handbook § 242.132 provides, *inter alia*, "(6) The special agent will not use trickery, misrepresentation or deception in obtaining any evidence or information, nor will he/she use language which might constitute a promise of immunity o[r] settlement of the principal's case, or which might constitute intimidation or threat."

information adverse to DiBiasi at the time in 1977 when DiBiasi and the others had been questioned in connection with the DiVivo investigation.

During a second telephone conversation between DiBiasi's attorney and the agent in charge of the DiVivo investigation, that agent told DiBiasi's attorney that the investigations of DiBiasi and the four others would not be handled by him but instead by other special agents of the IRS, but nevertheless advised DiBiasi's attorney to continue to deal directly with him on the question of voluntary cooperation and that he would coordinate with the other IRS agents.

On June 13, 1978, at a meeting attended by the agent in charge of the DiVivo investigation, the two agents in charge of the DiBiasi investigation, and the group supervisor of all three agents, DiBiasi's attorney complained about the tax investigations of his clients which he stated had been initiated by the IRS solely to gain cooperation from his clients in the tax investigation of DiVivo. The agents replied that they believed the investigations had been properly initiated and conducted.

On September 8, 1978, the summons in the instant case was issued by the IRS in furtherance of its investigation of DiBiasi. The latter has not opposed Equitable's compliance with that summons. However, DiVivo, exercising his right under 26 U.S.C. § 7609(b)(2), instructed Equitable not to comply. Equitable followed that instruction. Thereafter, the IRS initiated this action to compel compliance. DiVivo intervened pursuant to 26 U.S.C. § 7609(b)(1) and Federal Civil Rule 24(a). The District Court held an evidentiary hearing in which it heard direct testimony from the special agent investigating DiBiasi and permitted some cross-examination of that witness. However, the District Court terminated that cross-examination before it was completed, concluding that DiVivo lacked standing to mount his challenge to the IRS summons.[4] Before so doing, Judge Blair

expressed doubts as to whether the totality of the evidence proffered by counsel for DiVivo would, in any event, constitute a basis for denying enforcement of the summons.[5]

26 U.S.C. § 7609(b)(1) provides that any person named in a summons directed to a "third-party recordkeeper" is entitled to intervene in an action brought to enforce the summons. DiVivo was so named in the summons. He therefore had a right to intervene even though the summons is issued in connection with the DiBiasi investigation. DiVivo's right of intervention is, however, procedural, not substantive. "[T]he purpose of this procedure [*i. e.,* the procedure provided by what has since become § 7609(b)(1)] is to facilitate the opportunity of the noticee to raise defenses which are already available under the law (either to the noticee or to the third-party witness)[;] * * * these provisions are not intended to expand the substantive rights of these parties." S.Rep.No.938, 94th Cong., 2d Sess. 370–371, *reprinted in,* [1976] United States Code Congressional and Administrative News, pp. 2897, 3800; H.R.Rep. 658, 94th Cong., 2d Sess. 309, *reprinted in* [1976] United States Code Congressional and Administrative News, p. 3205. Thus, § 7609(b)(1) does not displace traditional principles of standing and does not permit a litigant to invoke rights belonging to someone else. Accordingly, DiVivo lacks standing to complain of violations of the Fifth Amendment rights of anyone else resulting from the failure of any IRS agent to warn DiBiasi or anyone else before such person answered questions asked in the course of the DiVivo investigation. However, DiVivo does have standing to question the good faith of the IRS in conducting the DiVivo investigation and in that regard may complain that the District Court should not permit its process to be abused by the issuance of a summons in a bad-faith civil tax investigation of DiBiasi.[6]

---

4. Joint Appendix, p. 131.

5. Joint Appendix, pp. 110–13, 125.

6. *See* the discussion *infra* at p. 501. In view of the pending investigation of DiVivo, it is not necessary to determine whether and under

The within case was commenced by the United States of America and W. Donald Bell, a special agent of the IRS, by the filing of a petition to enforce the IRS summons issued to Equitable. Therein, petitioners state that "Bell is conducting an investigation of the federal tax liabilities of Angelo DiBiasi for the tax years ending 1974 through 1977 inclusive. Mr. Angelo DiBiasi is a part owner of several Italian Delight Restaurants in Baltimore, Maryland."[7] Petitioners also allege: "It was and now is essential to the determination of the tax liabilities of Angelo DiBiasi for the years 1974 through 1977, inclusive,"[8] that the records sought by the summons be produced. Mr. Bell, in an affidavit filed with the petition, states that "in his capacity as a special agent, he is assigned to investigate the tax liabilities of Angelo DiBiasi for the tax years 1974 through 1977, inclusive."[9]

In his response to the petition, DiVivo as intervenor, admits that DiBiasi was "a part owner of several Italian Delight restaurants in Baltimore, Maryland (the metropolitan area, i. e.), but denies the allegation that Special Agent Bell is conducting a proper investigation of Angelo DiBiasi and states that said "alleged investigation has as *one of its purposes, if not the primary purpose,* to pressure Angelo DiBiasi into cooperating with the Internal Revenue Service in its investigation of Intervenor-Respondent."[10] (Emphasis supplied). Also, in his response, DiVivo takes the following position: "To the extent that the Internal Revenue Service investigation of Angelo DiBiasi, *inter alia,* has as *one of its purposes* to pressure him to cooperate in the Government's inves-

tigation of Victor DiVivo, said investigation has an improper purpose and/or is being conducted in bad faith."[11] (Emphasis of all but *inter alia* supplied).

In a memorandum filed December 13, 1978, p. 2,[12] in support of his opposition to the summons, DiVivo reiterates that "*one of the purposes of this investigation, if not the primary purpose,* is to pressure DiBiasi into cooperating with the Internal Revenue Service in its investigation of DiVivo * *.*" (Emphasis supplied).

During the hearing held on December 15, 1978 before Judge Blair, Agent Bell testified that he was "assigned to conduct the investigation of Angelo DiBiasi * * * around March of 1978," that no recommendations had been made by IRS to the Department of Justice for criminal prosecution of DiBiasi,[13] and that before he had taken steps to have issued the summons in question in this case, he had obtained approval from his "group manager."[14] On cross-examination, Mr. Bell testified that he had accompanied, as a witness, an agent working on the DiVivo investigation when one or more certain other persons had been questioned.[15]

During the hearing before Judge Blair, counsel for DiVivo stated that "five individuals and business associates of Mr. DiVivo * * * are simultaneously under investigation by the Internal Revenue Service including Mr. DiBiasi" and that DiVivo contends that "the investigation of these individuals was begun *solely or principally* as a subterfuge to get information against Mr. DiVivo,"[16] that the IRS questioned those

what conditions DiVivo would possess standing to challenge the abuse of process of this Court in the investigation of DiBiasi, if only the investigation of DiBiasi were ongoing.

7. Petition, Par. IV, Joint Appendix, p. 6.

8. Petition, Par. IX, Joint Appendix, p. 8.

9. Bell Affidavit, Par. 2, Joint Appendix, p. 12.

10. DiVivo Response, par. 4, Joint Appendix, p. 37.

11. DiVivo Response, par. 17, Joint Appendix, p. 39.

12. Joint Appendix, p. 52.

13. Joint Appendix, pp. 94–95.

14. Joint Appendix, p. 97.

15. Joint Appendix, p. 99.

16. It was only at that one moment and in that conclusory language that the record reveals any suggestion by DiVivo that the investigations of persons other than DiVivo were undertaken *solely* to further the DiVivo investigation.

persons without advising them of their rights and "then subsequently brought the investigation" of them, and that "[w]hat we are interested in finding out is why those other individuals are being investigated, and whether the IRS has any good faith purpose to investigate" them.[17] (Emphasis supplied). Earlier during the hearing[18] counsel for DiVivo suggested that perhaps information concerning the identity of persons other than DiVivo and DiBiasi might be given by Bell "in camera." Presumably the *in camera* technique could have been used to enable the District Court to have learned some details of the reasons of the IRS to investigate DiBiasi and/or others in addition to DiVivo. The Government position, in response, was that "the burden of showing the abuse of the Court's process is on the taxpayer" and that the latter "must make a substantial preliminary showing before even limited discovery can be ordered."[19] The reference to "discovery" seemingly related to the unrewarded desire of counsel for DiVivo, expressed before the evidentiary hearing commenced, to engage in discovery before the hearing was held.[20]

During cross-examination before Judge Blair, Bell also testified that one or more other "parties or associate[s] in business with Mr. DiVivo" were under investigation and that their investigations began "sometime in the beginning of 1978."[21] Bell's cross-examination was interrupted when Government counsel objected on several occasions to inquiries, which such counsel stated, were related "to the specifics of the investigations" and which he feared might "compromise an ongoing investigation." Judge Blair then asked DiVivo's counsel to state his "theory."[22] In response, after reviewing the historical facts largely set forth

*supra* in this opinion, counsel for DiVivo stated that in the course of questioning, in the presence of their counsel, certain individuals other than DiVivo, an IRS agent had asked questions *"that would indicate that the IRS had some information regarding these individuals themselves in the commission of tax crimes by them"* and that the "IRS was looking at *a pattern of connections,* a flow of income, expenses, and so forth *between Mr. DiVivo and his individual associates"* and that subsequently "the IRS apparently made a determination to investigate these individuals formally * * *."[23] (Emphasis supplied). Counsel expressed the conclusion that the IRS was not involved in a "full-scale investigation" of anyone other than DiVivo and was investigating the others "only insofar as they relate to Mr. DiVivo, and only insofar as they can make a case against Mr. DiVivo * * *."[24] Judge Blair's comment, after the lengthy presentation of DiVivo's "theory" by the latter's counsel was: "If I ruled without hearing any further evidence, I am going to rule for the Government without any question."[25] However, as indicated *supra*, in the end, Judge Blair denied the relief sought by DiVivo because of lack of standing.

In *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), Mr. Justice Harlan, for six members of the Court, reversed the Third Circuit's refusal to enforce an IRS summons pursuant to 26 U.S.C. § 7602 and held (at 51, 85 S.Ct. at 251) that in order "to obtain judicial enforcement of its orders" (footnote omitted) the IRS "need make no showing of probable cause to suspect fraud unless the taxpayer raises a substantial question that judicial

17. Joint Appendix, pp. 108–109.

18. Joint Appendix, pp. 100–111.

19. Joint Appendix, p. 113.

20. Joint Appendix, p. 91.

21. Joint Appendix, p. 116.

22. Joint Appendix, pp. 120–121.

23. Joint Appendix, p. 122. In their principal appellate brief filed in this Court, counsel for

DiVivo wrote (at p. 9) with regard to that questioning: " * * * it appears that the Internal Revenue Service may well have had incriminatory information about DiBiasi, et al. at the time of their Q & A's [questions and answers]."

24. Joint Appendix, p. 124.

25. Joint Appendix, p. 125.

enforcement of the administrative summons would be an abusive use of the court's process * * *." Additionally, the Justice wrote (at 57–58, 85 S.Ct. at 255):

[The IRS] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed * * *. It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the Court's process is on the taxpayer * * *. [Footnote omitted.] ·

In *Donaldson v. United States*, 400 U.S. 517, 536, 91 S.Ct. 534, 545, 27 L.Ed.2d 580 (1971), Mr. Justice Blackmun, for seven members of the Court, concluded:

We hold that under § 7602 an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution.

Earlier the Justice had commented (at 535, 91 S.Ct. at 544):

This demonstrates that the special agent may well conduct his investigation jointly with an agent from the Audit Division; that their combined efforts are directed to both civil and criminal infractions; and that any decision to recommend prosecution comes only after the investigation is complete or is sufficiently far along to support appropriate conclusions. The fact that a full-scale tax fraud investigation is being made does not necessarily mean that prosecution ensues when tax liability becomes apparent.

Congress clearly has authorized the use of the summons in investigating what may prove to be criminal conduct. [Footnote omitted.]

Mr. Justice Blackmun also authored the majority opinion in *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) in which the Supreme Court remanded for further proceedings a case in which the Seventh Circuit had affirmed the District Court's refusal to enforce a § 7602 summons. The four dissenters would have reversed and directed the courts below to enforce the summons without any further proceedings. In his opinion, Mr. Justice Blackmun framed the issue as follows (437 U.S. at 307–08, 98 S.Ct. at 2363):

The present case requires us to examine the limits of the good-faith use of an Internal Revenue summons issued under § 7602. As the preceding discussion demonstrates, *Donaldson* does not control the facts now before us. There, the taxpayer had argued that the mere potentiality of criminal prosecution should have precluded enforcement of the summons. 400 U.S. at 532, 91 S.Ct. 534 [at 543, 27 L.Ed.2d 580]. Here, on the other hand, the District Court found that Special Agent Olivero was investigating Gattuso "solely for the purpose of unearthing evidence of criminal conduct." 76–1 U.S. T.C., at 84,073, 37 A.F.T.R.2d, at 76–1240. The question then becomes whether this finding necessarily leads to the conclusion that the summonses were not issued in good-faith pursuit of the congressionally authorized purposes of § 7602.

In *LaSalle*, Mr. Justice Blackmun concluded (at 316–317, 98 S.Ct. at 2367):

As in *Donaldson*, then, where we refused to draw the line between permissible civil and impermissible criminal purposes at the entrance of the special agent into the investigation, 400 U.S. at 536, 91 S.Ct. 534 [at 545, 27 L.Ed.2d 580], we cannot draw it on the basis of the agent's personal intent. To do so would unnecessarily frustrate the enforcement of the tax laws by restricting the use of the summons according to the motivation of a single agent without regard to the enforcement

policy of the Service as an institution. Furthermore, the *inquiry into the criminal enforcement objectives of the agent would delay summons enforcement proceedings while parties clash over, and judges grapple with, the thought processes of each investigator.*[17] See *United States v. Morgan Guaranty Trust Co.,* [572 F.2d 36 (2d Cir. 1978)] supra. *This obviously is undesirable and unrewarding.* As a result, the question whether an investigation has solely criminal purposes must be answered only by an examination of the institutional posture of the IRS. Contrary to the assertion of respondents, this means that those opposing enforcement of a summons do bear the burden to disprove the actual existence of a valid civil tax determination or collection purpose by the Service. After all, the purpose of the good-faith inquiry is to determine whether the agency is honestly pursuing the goals of § 7602 by issuing the summons. [Emphasis supplied.]

[17] We recognize, of course, that examination of agent motive may be necessary to evaluate the good-faith factors of Powell, for example, to consider whether a summons was issued to harass a taxpayer.

Without doubt, this burden is a heavy one. Because criminal and civil fraud liabilities are coterminous, the Service rarely will be found to have acted in bad faith by pursuing the former. On the other hand, we cannot abandon this aspect of the good-faith inquiry altogether.[18] We shall not countenance delay in submitting a recommendation to the Justice Department when there is an institutional commitment to make the referral and the Service merely would like to gather additional evidence for the prosecution. Such a delay would be tantamount to the use of the summons authority after the recommendation and would permit the Government to expand its criminal discovery rights. Similarly, the good-faith standard will not permit the IRS to become an information gathering agency for other departments, including

the Department of Justice, regardless of the status of criminal cases.[19]

[18] The dissent would abandon this aspect of the good-faith inquiry. It would permit the IRS to use the summons authority solely for criminal investigation. It reaches this conclusion because it says the Code contains no limitation to prevent such use. Its argument reveals a fundamental misunderstanding about the authority of the IRS. The Service does not enjoy inherent authority to summon production of the private papers of citizens. It may exercise only that authority granted by Congress. In § 7602 Congress has bestowed upon the Service the authority to summon production for four purposes only: for "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability." Congress therefore intended the summons authority to be used to aid the determination and collection of taxes. These purposes do not include the goal of filing criminal charges against citizens. Consequently, summons authority does not exist to aid criminal investigations solely. The error of the dissent is that it seeks a limit on the face of the statute when it should seek an affirmative grant of summons authority for purely criminal investigations. We have made that search and could uncover nothing in the Code or its legislative history to suggest that Congress intended to permit exclusively criminal use of summonses. As a result, the IRS employs its authority in good faith when it pursues the four purposes of § 7602, which do not include aiding criminal investigations solely.

[19] To the limited extent that the institutional good faith of the Service with regard to criminal purpose may be questioned before any recommendation to the Department of Justice, our position on this issue necessarily rejects the Government's argument that prerecommendation enforcement of summonses must meet only the Powell elements of good faith. We have concluded that the Government's contention fails to recognize the essence of the good-faith inquiry. The *Powell* elements were not intended as an exclusive statement about the meaning of good faith. They were examples of agency action not in good-faith pursuit of the congressionally authorized purposes of § 7602. The dispositive question in each case, then, is whether the Service is pursuing the authorized purposes in good faith.

■ At oral argument before us, government counsel indicated that the taxpayer's burden to show lack of good faith is so great that a district court need seldom if ever hold an evidentiary hearing before enforcing a § 7602 summons. We reject that position, as did the Supreme Court in *La-*

*Salle* (n. 17, n. 19), because there are instances in which such a hearing will clearly be required.

Such was the case in *United States v. McCarthy*, 514 F.2d 368 (3rd Cir. 1975) in which defendants stated with sufficient particularity factual support for their allegations that the IRS "had no intention of pursuing any civil remedies" (; at 375)[26] and also that the IRS, having made one inspection of the records sought, was harassing the defendants in seeking a second inspection (; at 375–76). *And see,* in a different context, *Lord v. Kelley,* 223 F.Supp. 684, 689 (D.Mass.1963), *appeal dismissed on other grounds,* 334 F.2d 742 (1st Cir. 1964) in which Judge Wyzanski in the District Court wrote (223 F.Supp. at 689–690):

> When a special agent of the Internal Revenue Service tells an accountant who, so far as appears, is quite innocent of wrongdoing, that unless he turns over his clients' records and cooperates with the Internal Revenue Service the accountant will be in trouble, the agent is close to extortion.

▉▉ In *United States v. McGuirt,* 588 F.2d 419 (4th Cir. 1978), the District Court, after conducting an evidentiary hearing, refused to enforce a § 7602 summons. Reversing, Judge Hall wrote (at 422) that "inconvenience is not harassment" and did not, in *McGuirt,* add up to bad faith. In this case, no recommendations have seemingly been made by IRS to the Department of Justice for criminal prosecution of any of the persons under investigation. There are no allegations that the IRS is not interested in the civil aspects of the tax liability of DiBiasi and the four persons questioned with him. There are only allegations of bad faith because of the failure to warn targets or potential targets, and because of the discussion of immunity, all according to DiVivo in violation by the IRS of its own regulations. The failure to warn DiBiasi

and the four others hardly in and of itself shows any bad faith. The violation by the IRS of its own regulations, which at trial does not necessarily provide a basis for the application of the exclusionary rule in the absence of a deliberate or prejudicial violation or the denial of a constitutional or statutory right, *see United States v. Caceres,* 440 U.S. 741, 752, 754, 99 S.Ct. 1465, 1472, 1473, 59 L.Ed.2d 733, 744, 745 (1979), is also not proof by itself of bad faith in a tax investigation. As to the immunity discussion, the attorney for DiBiasi, in an affidavit, has stated that during the telephone conversation on April 13, 1978, "the subject of immunity arose."[27] Even assuming that the IRS agent in charge of the DiVivo investigation first raised the subject of immunity and even noting that the IRS Manual instructed agents in terms of "conduct to be avoided" they are to refrain from "statements or questions which may be construed as offers of immunity or attempts to settle civil liabilities in pending criminal cases,"[28] the IRS is expressly provided with authority to allow both criminal and civil immunity in return for testimony against another. *See United States v. Barrett,* 505 F.2d 1091, 1101–02 (7th Cir. 1974) in which 18 U.S.C. § 6002 re criminal immunity and 26 U.S.C. § 7122 were discussed. While it is true that in *Barrett,* the immunity arrangements were made after reference to the Attorney General for prosecution, the parties to the discussions apparently believed that IRS approval was required. In *Barrett,* Judge Sprecher wrote (at 1102):

> The significance of section 7122 for defendant is that the end the government was seeking to accomplish—Meyers' exemption from civil tax liability—was authorized by law. If the government can excuse criminal or civil liability in settling a criminal case, surely it can use that power of compromise to obtain guilty pleas or to procure testimony in

---

26. *See also, United States v. Garden State Nat. Bank,* 465 F.Supp. 437, 43 A.F.T.R.2d ¶ 79–405 (D.N.J.1979) in which that same question is discussed.

27. Joint Appendix, p. 45.

28. *See* n. 3, *supra.*

other proceedings. Both are legitimate objectives of plea bargaining.[29]

It is true that in *Powell* the Supreme Court has stated that "put[ting] pressure on [a taxpayer] to settle a collateral dispute" (379 U.S. at 58, 85 S.Ct. at 255) is an example of bad faith in the use of a § 7602 summons. But that was written in the context of a case in which the Court was discussing alleged repetitive inspections by the IRS and does not mean that settlement or compromise or even immunity approaches in and of themselves indicate lack of good faith use of a § 7602 summons to aid in civil tax collection.

■ Careful examination of the record reveals that if Judge Blair had followed his inclination expressed near the end of the evidentiary hearing he conducted and had held that there were insufficient allegations by DiVivo to require any further evidentiary inquiry, he would not have been in error. While the District Court's termination herein of the evidentiary hearing may not rest on lack of standing on the part of DiVivo, that termination was fully justified. By the time Judge Blair ended the hearing, he had heard the lengthy proffer from counsel for DiVivo as well as considerable testimony from the special agent in charge of the DiBiasi investigation which disclosed that DiVivo's attack on the good faith of the IRS investigation was without merit.

■ *Powell* speaks to the need of a Court "not [to] permit its process to be abused." *United States v. Powell, supra,* at 58, 85 S.Ct. at 255. Since DiVivo was named in the summons and therefore has standing to intervene in this case, DiVivo may bring the abuse-of-court-process contention to the District Court's attention and ask the District Court not to ignore the same, even if the abuse complained of involves no violation of any right of DiVivo. But, even so assuming, DiVivo's allegations,

proffers and contentions, if accepted as factually accurate, and giving DiVivo the benefit of all reasonable inferences add up only to the following: (1) That the IRS was principally and primarily interested in DiVivo and only secondarily interested in DiBiasi and certain other partners or associates of DiVivo, and (2) that the IRS would not have investigated any of those persons other than DiVivo if the IRS had not been investigating DiVivo or if one or more or all of those others had cooperated with the IRS against DiVivo. Assuming those facts, such conduct hardly constitutes an abuse of the process of the District Court. There are many criminal cases in which minor defendants are named who would not have been singled out and prosecuted but for the Government's prosecutorial decision to proceed against the major participant or participants. The inclusion of certain minor defendants is often sought by the prosecutor in the hope that one or more of them will enter into agreements to cooperate with the government in return for an undertaking by the government to seek a dismissal or to recommend leniency. Such practices, which have not been deemed inappropriate, *see generally Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663 (1978), would not seem different than those involved herein. At no time has DiVivo suggested, except once[30] in a single isolated conclusory oral assertion by counsel, that the civil tax investigations of DiBiasi and the others were themselves phony, *i. e.,* that there was no factual basis upon which the IRS could have conducted an investigation to determine whether DiBiasi and the others, as admitted partners and associates of DiVivo, violated any of their respective civil tax duties and that the IRS did not decide to conduct such investigations. Perhaps, with 20–20 hindsight, the District Court might have required the Government, be-

---

**29.** *See* generally as to plea bargaining, *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). *See also* as to the power of the IRS to compromise, *United States v. Garden State Nat. Bank, supra* at n. 6.

**30.** *See* p. 496 and n. 16, *supra.*

fore terminating the hearing, to file, *in camera,* an affidavit by Mr. Bell or one or more others, pursuant to Federal Civil Rule 56, giving some details as to the alleged civil tax violations of DiBiasi and the others and the IRS's reasons for investigating those possible violations. But even the use of such summary-type procedures must be carefully tailored to prevent delay of "summons enforcement proceedings while parties clash over, and judges grapple with, the thought processes of each investigator." *United States v. Morgan Guaranty Trust Co.,* quoted by Mr. Justice Blackmun in *United States v. LaSalle National Bank,* 437 U.S. at 316, 98 S.Ct. 2357, 2367. In this case the record discloses close cooperation between counsel for DiVivo, on the one hand, and counsel for DiBiasi and certain of the other partners and associates of DiVivo, on the other hand. There is every reason to believe that if there were no basis for the civil tax investigations of DiBiasi and the others, counsel for DiVivo as well as counsel for DiBiasi would know the same and that DiVivo would have presented specifics as to the same in one or more documents pursuant to Federal Civil Rule 56 and/or have informed the District Court of the same during DiVivo's counsel's presentation of DiVivo's "theory" of this case. There is thus no need, in this case, to remand for further presentation and consideration of further evidence to and by the District Court in order to afford the opportunity to DiVivo to prove abuse of the process of the District Court by the enforcement of the summons in the civil tax investigation of DiBiasi. DiVivo has had that opportunity and has fallen short of alleging or proffering facts or theory entitling him to any further evidentiary hearing or to any of the relief he seeks.

The judgment below is accordingly affirmed.

WINTER, Circuit Judge, dissenting:

I agree with the majority that DiVivo has standing as an intervenor to raise the question of the good faith of the Internal Revenue Service in issuing the summons for records relating to his business dealings with DiBiasi. I disagree, however, that DiVivo has failed to allege facts sufficient to defeat enforcement of the summons. Relying on the standards enunciated by the Supreme Court in *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), I would hold that, when the IRS undertakes investigation of a taxpayer for the primary purpose of pressuring him to give evidence against another taxpayer, the investigation is not conducted in good faith and a summons issued in the course of the investigation is therefore not enforceable. In the instant case, DiVivo has alleged that "one of [the] purposes, if not the primary purpose [of the IRS investigation of DiBiasi is] to pressure DiBiasi into cooperating with the Internal Revenue Service in its investigation of [DiVivo]." Moreover, he has proffered evidence which tends to support his allegation. I therefore believe that the district court erred in denying DiVivo the opportunity to prove his allegation. I respectfully dissent.

*Powell* established that a district court should not enforce a summons issued in the course of an investigation that is not undertaken in good faith. In his opinion for the Court, Justice Harlan stated:

> It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer . . . ..

*Id.* at 58, 85 S.Ct. at 255. Although the claim of harassment advanced by the taxpayer in *Powell* involved repetitive summonses, the broad scope of the quoted language makes clear that other forms of harassment or bad faith will also render a summons unenforceable. The broad appli-

cability of the *Powell* standards was reaffirmed in *United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). In particular, *LaSalle* made clear that the *Powell* standards are independent of, and in addition to, the requirement that a summons must be issued before the IRS has abandoned the pursuit of civil tax determination or collection in favor of criminal prosecution. *See id.* at 317 n. 19, 318, 98 S.Ct. 2357.

DiVivo has alleged that the IRS undertook its investigation of DiBiasi and issued the summons in question for the purpose, if not the primary purpose, of pressuring DiBiasi into cooperating with the investigation of DiVivo by giving evidence against him. If it is proved that the primary purpose of the investigation and the summons was to force DiBiasi's cooperation in the DiVivo investigation, then I think *Powell* requires that enforcement of the summons be denied. It is difficult to conceive of an example of bad faith that would better qualify as "an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute."

The majority seeks to justify the purpose attributed by DiVivo to the IRS by citing the authority granted to the IRS under I.R.C. § 7122(a) to compromise any civil or criminal tax case, prior to referral to the Department of Justice. In *United States v. Barrett,* 505 F.2d 1091, 1100–03 (7 Cir. 1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975), § 7122(a) was relied upon to permit the grant of civil tax immunity to the accomplice of a bribery defendant, with respect to the income tax owed by the accomplice on bribes which passed through his hands, in exchange for the accomplice's testimony against the defendant. But the power of the IRS to compromise tax cases has no bearing on the question before us. DiVivo does not deny that if the IRS had undertaken an investigation of DiBiasi in good faith for the primary purpose of determining and collecting DiBiasi's tax liability, then the IRS could properly issue summonses pursuant to that investigation and could ultimately compromise DiBiasi's case in exchange for his testi-

mony against DiVivo. Rather, DiVivo alleges that the investigation of DiBiasi was undertaken in bad faith as a pressure tactic to force DiBiasi to cooperate in the investigation of DiVivo. Nothing in § 7122(a) or *Barrett* authorizes the IRS to undertake or pursue an investigation for such a primary purpose.

I fully recognize the difficulty that DiVivo would have in proving his case. *Powell* places the burden of proving bad faith on the party opposing enforcement, 379 U.S. at 58, 85 S.Ct. 248, and this burden is a heavy one indeed. In order to prevent enforcement of the summons, DiVivo would have to prove that the primary purpose of the investigation of DiBiasi was not to determine and collect his tax liability but rather to pressure him to give evidence against DiVivo. Although such proof would be quite difficult to establish, DiVivo proffered evidence to the district court, *inter alia,* that DiBiasi was contacted about cooperating with the DiVivo investigation very soon after receiving notification of his own investigation; that DiBiasi was told to contact the Special Agent in charge of the DiVivo investigation, rather than the agents handling his own investigation; and that the DiBiasi investigation has been characterized by several other unexplained departures from standard IRS procedures. While such evidence may be insufficient to prove the ultimate fact sought to be established, it was sufficient to raise a genuine dispute on the question of good faith of the IRS, and the district court therefore erred in denying DiVivo "the adversary hearing to which [he] is entitled before enforcement [of the summons] is ordered," *id.*

Although I share the concern expressed by the majority that consideration by district courts of objections charging IRS bad faith may unduly delay the enforcement of IRS summonses, I doubt that such objections will be frequent. The difficulty of proving IRS bad faith, which I discuss above, will be a deterrent to many unfounded objections. Summary procedures, where appropriate, can assist in the expeditious disposition of such objections. *See id.* at 58

n. 18, 85 S.Ct. 248 (Federal Rules of Civil Procedure govern proceedings to enforce IRS summonses). In any event, both Congress and the Supreme Court have determined that full consideration of objections to the validity of a summons is worth the delay that may result. Congress has provided for a judicial hearing prior to the enforcement of a summons and for the right of a person in DiVivo's position to intervene in such a proceeding. *See* I.R.C. §§ 7604(b), 7609(b)(1). And, as the majority notes, the Supreme Court has indicated that occasional delays caused by the consideration of unmeritorious objections to IRS summonses is the necessary price for ensuring that the process of the courts is not abused. *See United States v. LaSalle National Bank,* 437 U.S. at 316 n. 17, 98 S.Ct. 2357; *United States v. Powell,* 379 U.S. at 58, 85 S.Ct. 248.

I would reverse the judgment of the district court and remand the case for a full hearing on DiVivo's allegations of IRS bad faith.