UNITED STATES of America, Plaintiff,

v.

Jack A. DAHLSTRUM, Defendant.

Crim. No. 80–187–AAH.

United States District Court,
C. D. California.

July 11, 1980.

Andrea Sheridan Ordin, U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division, Los Angeles, Cal. by Jerrold L. Kluger, Trial Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Hochman, Salkin & DeRoy by Bruce I. Hochman and Barry L. Guterman, Beverly Hills, Cal., for defendant.

## DECISION AND ORDER

HAUK, District Judge.

The defendant, Jack A. Dahlstrum, was charged in a three count indictment with wilful failure to file individual income tax returns for the years 1973 through 1975 in violation of 26 U.S.C. § 7203.[1] Following the defendant's not guilty plea and waiver of jury trial, this Court began hearing testimony in this matter on April 14, 1980.

During the trial, however, this Court heard testimony which raises serious questions concerning the procedures followed by the Internal Revenue Service in the investigation of defendant Dahlstrum. Specifically, this Court was interested in the basis, propriety, and good-faith of the IRS in issuing to the defendant's accountant an administrative civil summons, pursuant to its authority under 26 U.S.C. § 7602.[2] In light of the testimony, this Court, on its own motion, undertook to determine whether or not there were any violations of the defendant's rights by the IRS, as set forth in *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) and its progeny. Following that inquiry, this Court has determined to its complete satisfaction that the issuance of the summons was unlawful, because the IRS had abandoned its investigation of the defendant's civil tax liability at the time the particular summons was issued in this case. Concluding that the governmental misconduct has tainted the entire prosecution of the defendant, this Court then orders that the indictment be dismissed with prejudice.

## I.  BACKGROUND

The defendant is an attorney admitted to the California Bar who actively practiced law from 1958 to 1976. He specialized in trial work and his criminal tax practice included acting as counsel for Mickey Cohen during the latter's famous tax prosecution.

In his trial memorandum, defendant Dahlstrum admitted that he did not file his personal income tax returns for 1973, 1974, and 1975 on a timely basis. He indicated that the returns for these years were filed delinquently on June 14, 1977. Dahlstrum also asserted that he had a history of "late filing" which quite often resulted in the assessment of civil penalties. He attributed this pattern of late filing to a long history of negligent handling of his personal affairs. Four marriages and borderline alcoholism allegedly reduced him to such a

---

1. 26 U.S.C. § 7203 provides as follows:

   Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than one year, or both, together with the costs of prosecution.

2. Under 26 U.S.C. 7602 of the Internal Revenue Service is authorized to summon any person having possession, custody or care of books, records, papers, or other data which may be relevant or material to the "purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability."

"chaotic and self-destructive" state that it caused him to leave his lucrative law practice in early 1976. Finally, Dahlstrum claimed that in spite of these personal difficulties, he had engaged an accountant and an attorney to assist him in preparing his tax returns for 1973 through 1975 prior to the Internal Revenue Service's initiation of the criminal investigation into his affairs.

During the presentation of the government's case, this Court heard the testimony of David Ostrove, an attorney who had represented Dahlstrum at the time the IRS initiated its criminal investigation in this case. Ostrove testified that he had contacted Special Agent Marc Schreiber of the IRS's Intelligence Division [3] following the issuance to Dahlstrum's accountant of an administrative summons on February 3, 1977. This Court became particularly concerned when Ostrove stated that Schreiber had refused to discuss the civil end of the investigation with him and was told that Schreiber was interested only in the criminal aspects of the case. Ostrove further testified that Schreiber took this position on more than one occasion following the issuance of the summons.

■ At that point, this Court, very much troubled by the purport and potential significance of Ostrove's testimony, initiated an inquiry for the purposes of ascertaining whether there were any violations of the defendant's rights under *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) and its progeny. The Supreme Court in *LaSalle*, Mr. Justice Blackmun writing for the majority, established several requirements for the issuance of a valid summons by the IRS

under § 7602. Initially, the summons must be issued before the IRS makes a criminal referral or recommendation for prosecution to the Department of Justice. 437 U.S. at 318, 98 S.Ct. at 2368. In addition, the IRS is required to use its summons authority "in good faith pursuit of the congressionally authorized purposes of § 7602" and to adhere to the standards set forth in *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964).[4] *LaSalle* at 318. The Supreme Court further held that the IRS's summons authority did not exist to aid solely criminal investigations and that Congressional purposes would be thwarted if the IRS abandoned in an "institutional" sense the pursuit of civil tax determination or collection. *Id.* at 316, n. 18, 317–318, 98 S.Ct. at 2367, 2368. The inquiry conducted here by this Court, therefore, was directed to whether the IRS's criminal investigation of the defendant was in compliance with the good-faith restraints set forth in *LaSalle*.

## II. THE IRS CRIMINAL INVESTIGATION OF DAHLSTRUM

The IRS criminal investigation of the defendant had its genesis in a referral made by its Collection Division to the Intelligence Division on May 17, 1976, when the referring revenue officer, R. D. Leslie, determined that Dahlstrum had not filed federal income tax returns for the calendar year 1973 and later years. At the time of the referral, Leslie terminated further collection efforts regarding a 1972 income tax deficiency of the defendant and ceased his civil investigation of Dahlstrum's failure to file income tax returns for the calendar years subsequent to 1972.

---

**3.** The Intelligence Division is now known as the Criminal Investigation Division and is responsible for developing evidence required to prove criminal violations and the ad valorem penalties for civil fraud, negligence, and delinquency. *See*: Internal Revenue Manual, Ch. 4500, § 4565.31(4) (CCH 1979).

**4.** In *Powell*, the Supreme Court delineated several elements which go to the exercise of good-faith under § 7602:

[the Service] must show that the investigation will be conducted pursuant to a legiti-

mate purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed . . [A] court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 57–58, 85 S.Ct. at 255.

Under IRS procedure, within 20 workdays after receipt of the referral report, the Intelligence Division must notify the referring division whether the referral has been declined or accepted for investigation and whether or not a cooperating civil officer is requested. Internal Revenue Manual, Ch. 4500, § 4565.23(2) (CCH 1979). If a referral is accepted by the Intelligence Division, a "joint investigation," in IRS parlance, may be initiated.

While the referral made by Revenue Officer Leslie was subsequently accepted by the Chief of the *criminal* Intelligence Division, a cooperating *civil* revenue officer was *not* requested at that time.[5] On November 12, 1976, Special Agent Joseph W. Enders, a member of the Intelligence Division, was assigned by the Division Chief to handle the criminal investigation of Dahlstrum for failure to file income tax returns and failure to pay taxes in violation of 26 U.S.C. § 7203. However, on January 14, 1977, Special Agent Marc Schreiber, also a member of the Intelligence Division, was assigned to handle Dahlstrum's criminal investigation case because of Special Agent Enders' heavy caseload.

On February 3, 1977, Schreiber, with the approval of his group manager, Thomas W. Sullivan, then issued the statutorily authorized *civil* summons to Dahlstrum's accountant, pursuant to § 7602. This summons sought the production of books and records possessed by the accountant relating to Dahlstrum and his law partnership, including the partnership returns for the calendar years 1973, 1974 and 1975.

Following the issuance of this civil summons, Dahlstrum's attorney, David Ostrove, sought in vain to obtain the cooperation of the IRS in dealing with the civil side of the Dahlstrum tax investigation.[6] Ostrove attempted without success to locate any revenue officer in either the Los Angeles or Riverside County offices of the IRS who knew anything about Dahlstrum's civil tax status. Because of the difficulty he was having in settling the amounts and making payment of Dahlstrum's back taxes, on a number of occasions during this period, Ostrove also endeavored to discuss the civil aspects of the case with Schreiber. He wrote to Schreiber on June 13, 1977, indicating that Dahlstrum intended to file his 1973 through 1975 returns the next day (June 14, 1977) and requested Schreiber's cooperation in setting up a payment schedule for Dahlstrum's delinquent returns. Ostrove explained that Dahlstrum wished to re-establish his law practice without the cloud of the IRS hanging over his head. Ostrove also informed Schreiber that Dahlstrum had begun his arrangements for the filing of his returns prior to any contact by IRS criminal investigative Special Agents and that the payment of the taxes on those returns was not the result of any contact by such Special Agents. It is not clear whether or not Ostrove was aware at the time that a cooperating revenue officer, Michael Maynard, had been assigned on May 23, 1977, to assist Schreiber in developing the IRS criminal investigation. Despite the assignment of Maynard, however, the general response Ostrove received to his June 13, 1977 request, as well as to others made during the period following the issuance of the summons, was that the civil end of the investigation was not in Schreiber's department or within his province to act upon.[7]

---

**5.** On the standard referral form utilized by Leslie was a box indicating whether a cooperating revenue officer was requested to be assigned to the case. This box was never checked.

**6.** On or about February 4, 1977, Ostrove telephoned Schreiber regarding the summons. Schreiber at that time refused to discuss the case with Ostrove, but did relate that he was not interested in either the civil aspects of the case, or whether the taxes owing to the IRS were paid or not. Subsequently, on February

14, 1980, the requested documents were turned over to the IRS.

**7.** Ostrove also sent another letter to Schreiber dated July 7, 1977, requesting a response to his letter of June 13, 1977. In this July 7 letter he reiterated his request that Schreiber forward a copy of his earlier letter to an appropriate collection officer and further stated that Dahlstrum did not want to resume the practice of law until a payment plan had been agreed to with the I.R.S.

On January 3, 1978, Schreiber and Maynard culminated their investigation with the filing of a joint report which recommended that criminal prosecution referral and fraud penalty be pursued in Dahlstrum's case.

## III. THE IRS "INSTITUTIONAL BAD FAITH" IN LIGHT OF LaSALLE AND ITS PROGENY

Assuming that this Court's inquiry into the issuance of the summons was proper,[8] two issues emerge in the application of LaSalle to the facts of this case. The first issue relates to the question of when during an IRS investigation the Court may apply LaSalle's good-faith restraints on the IRS. The second issue concerns the circumstances under which "institutional bad faith" may be found if there is evidence to indicate that the summons was issued "solely to aid a criminal investigation."

The problem of when a court may apply LaSalle to an IRS investigation becomes significant in light of the fact that Special Agent Schreiber during his solely criminal investigation issued the challenged summons prior to his January 3, 1978 recommendation to his superiors that a criminal

referral be made, and prior to the IRS criminal referral to the Justice Department. In LaSalle, the Court indicated that the critical period of focus for the purposes of determining IRS bad faith, normally should be after a criminal referral is made to the Justice Department by the IRS. The majority felt that an earlier imposition of the good-faith requirements might unduly hamstring the ability of the Service to perform its duties and that the possibility of agency abuse was remote at such an early stage. United States v. LaSalle National Bank, 437 U.S. 298, 313 n. 15, 98 S.Ct. 2357, 2365 n. 15, 57 L.Ed.2d 221.

The Court did state, however, that despite the "co-terminous" aspects of criminal and civil fraud liabilities,[9] it could not countenance an abandonment of the good-faith inquiry when there existed an institutional commitment to refer a case for criminal prosecution and the civil summons under § 7602 was still issued. This could occur in situations where there was a delay in submitting a criminal referral and where the Service was gathering additional evidence for a criminal prosecution. Id. at 316–17, 98 S.Ct. at 2367. The Court held that such

---

**8.** This Court recognizes that in a typical LaSalle hearing it is the taxpayer who normally assumes the burden of challenging the IRS's good faith in issuing an administrative summons and that this burden is a heavy one, not met by a mere conclusionary showing. U. S. v. LaSalle National Bank, 437 U.S. at 316, 98 S.Ct. at 2367; U. S. v. Powell, 379 U.S. at 58, 85 S.Ct. at 255 (1964). The usual LaSalle inquiry arises when a taxpayer challenges the enforcement of an IRS summons. However, in this matter criminal trial proceedings had already been initiated against the defendant when potential LaSalle problems were raised. Thus, for this Court to initiate and conduct a LaSalle inquiry on its motion becomes somewhat of a departure from a normal LaSalle hearing. The Supreme Court in Powell, in reaffirming the taxpayer's right to challenge the enforcement of an IRS summons, added that since it was "the court's process which is invoked to enforce the administrative summons," a court could not permit its process to be abused. 379 U.S. at 58, 85 S.Ct. at 255. Thus, it would be anomalous, indeed, if this Court, in the exercise of its discretionary and supervisory powers were not permitted to initiate an inquiry on its own motion in order to preserve and protect the princi-

ples laid down by the Supreme Court in the summons enforcement cases. A court must be permitted to query and determine whether there is evidence of a LaSalle violation once jeopardy has attached and criminal proceedings against a defendant have begun. This represents the only logical result if a defendant's due process rights are to be maintained and the Court's process to remain inviolate and unabused.

**9.** Justice Blackmun wrote that the IRS's performance of its civil functions "is not necessarily overturned by a single agent who attempts to build a criminal case," and for the IRS to conduct a solely criminal investigation "would require an extraordinary departure from the normally inseparable goals of examining whether the basis exists for criminal charges and for the assessment of civil penalties." 437 U.S. at 314, 98 S.Ct. at 2366. Nevertheless, Justice Blackmun did conclude later that IRS institutional bad faith could result in situations where a summons was issued and there already existed an institutional commitment to refer the case for criminal prosecution. Id. at 316–317, 98 S.Ct. at 2367.

delays "would be tantamount to the use of the summons authority after the recommendation and would permit the Government to expand its criminal discovery rights." *Id.*, at 317, 98 S.Ct. at 2368. Thus the good-faith standard was not to be construed as permitting the IRS to become an "information-gathering agency" for other governmental departments, including the Department of Justice. *Id.*

In this connection, the *LaSalle* Court suggested that an "institutional" commitment to prosecute before a criminal referral has been made to the Justice Department could possibly be shown after a Special Agent has made a recommendation to his superiors.[10] The Court was reluctant, however, to apply *LaSalle* to situations where the Special Agent had not yet recommended to his superiors that a criminal referral be made. Underlying this view, no doubt, was the Court's concern that it might cause unnecessary delays in IRS investigations and otherwise impede the IRS's ability to adequately perform its "co-terminous" civil and criminal functions.

However, application of the *LaSalle* doctrine at an earlier stage of a solely criminal investigation was not ruled out by the Supreme Court. The *LaSalle* majority, in observing that deliberate delay of a referral could not be condoned, also recognized that "other forms of agency abuse of congressional authority and judicial process" might arise in future cases. *Id.* at 318 n. 20, 98 S.Ct. at 2368 n. 20. Therefore, since the facts here in this case present a rather novel form of *LaSalle* governmental misconduct, this Court finds that it is not precluded from applying *LaSalle* to the civil summons issued by Schreiber.

Moreover, this Court has the benefit of conducting its *LaSalle* inquiry from a perspective of hindsight. This advantage has a two-fold effect. First, looking at the issued civil summons from hindsight neutralizes the Supreme Court's legitimate concern that the IRS might be hampered in the performance of its functions, because the IRS investigation in this case had already been completed and criminal trial proceedings initiated before the *LaSalle* question arose here. Secondly, many of the difficulties normally encountered in a *LaSalle* enforcement hearing are nullified, thereby making easier the analysis of the challenged summons. *See*: Note, "The Institutional Bad Faith Defense to the Enforcement of IRS Summonses," 80 Colum.L.Rev. 621, 627 n. 45 (1980).

Thus, assuming the application of *LaSalle* to this case to be appropriate, the focus shifts to the IRS "institutional bad faith" in issuing a summons to Dahlstrum. As stated earlier, the Supreme Court in *LaSalle* provided two examples of institutional bad faith which could not be condoned: a delay in a recommendation of prosecution to the Justice Department in order to acquire additional information for use at trial, and issuance of the summons for the purposes of gathering information for the use of other agencies. 437 U.S. at 317, 98 S.Ct. at 2368. From the facts presented to this Court here, the "information-gathering" form of abuse is clearly relevant to this case, because the evidence obtained by the civil summons was later utilized by the Justice Department in this criminal prosecution. Moreover, the absence of any ongoing IRS civil investigation of the defendant necessarily arouses judicial curiosity and an inquiry as to whether in fact there was some sort of nexus between the IRS's criminal investigation and the subsequent Justice Department prosecution.

In *LaSalle*, Justice Blackmun addressed the question of whether a summons could

---

**10.** The Court pointed out that following an agent's recommendation that a criminal referral be made, the recommendation itself passes through several layers of review before the IRS makes its formal recommendation to the Justice Department that the matter be criminally prosecuted. During this period, an "institutional commitment" to prosecute could conceivably be formed (i. e., evidence that an agent's superiors were holding up approval of the recommendation or where the civil summons under § 7602 was issued during the review stage solely to aid the development of a criminal investigation for another government agency).

issue under § 7602 to further a criminal investigation:

> The Service does not enjoy inherent authority to summon production of the private papers of citizens. It may exercise only that authority granted by Congress. In § 7602 Congress has bestowed upon the Service the authority to summon production for four purposes only: for 'ascertaining the correctness of any return, making a return where none had been made, determining the liability of any person for any internal revenue tax . . or collecting any such liability.' Congress therefore intended the summons authority to be used to aid the determination and collection of taxes. These purposes do not include the goal of filing criminal charges against citizens. Consequently, summons authority does not exist to aid criminal investigations solely." 437 U.S. 316–17, n. 18, 98 S.Ct. 2367 n. 18.

In *United States v. Genser*, 595 F.2d 146 (3d Cir. 1979), *cert. denied*, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979), the substantive implications of *LaSalle* vis-a-vis "solely criminal investigations" were discussed further.[11] The Third Circuit interpreted the *LaSalle* Court's holding that a summons may not be used "solely for a criminal purpose" to mean that the IRS must show that the validity of a summons does not simply rest upon the existence of a "general civil purpose" for the entire investigation, but rather upon the purposes of the individual summons in issue. 595 F.2d at 150. In formulating this standard,[12] the *Genser* Court found that if any individual summons was issued for solely criminal purposes, it would be unlawful, even in the face of evidence as to a civil purpose for the investigation as a whole. *Id.* at 150. The Third Circuit reasoned that this interpretation was necessary to protect the taxpayer from facing an almost impossible burden of proof, since he or she would be required to show the absence of civil tax consequences in an IRS investigation even though the *LaSalle* Court had stated that civil and criminal liability are "co-terminous."

In addition, the *Genser* Court recognized that the principles of good-faith enunciated in *LaSalle* would be circumvented in that abuses "would go undetected and unremedied." *Id.* Thus, to permit the IRS to argue that a civil investigation is ongoing because the taxpayer's civil liability has not yet been determined, would permit the IRS to become an information-gathering tool for the Justice Department. As the *Genser* Court pointed out, the principles of restraint set forth in *LaSalle* prohibit such subterfuge. *Id.*

. The "summons-by-summons" approach adopted in *Genser* becomes important in light of the position the IRS took in this case with respect to its civil investigation of Dahlstrum. The IRS attempted to argue that it was conducting a "joint" investigation of Dahlstrum at the time the summons was issued. A joint investigation is one conducted by the Criminal Investigation Division, together with either the Examination or Collection Divisions.[13] Internal Revenue Manual, ch. 9300, § 9324.1 (CCH 1979). Thomas W. Sullivan, Special Agent Schreiber's group manager, testified that the IRS viewed Dahlstrum's investigation as being "joint," despite the fact that no cooperating revenue officer had been requested or was involved in the case at the time the sum-

11. In addition to *Genser* there are a number of decisions following *LaSalle* which have grappled with its implications. *See, e. g. United States v. Cortese*, 614 F.2d 914 (3d Cir. 1980); *United States v. Serubo*, 604 F.2d 807 (3d Cir. 1979); *United States v. Chase Manhattan Bank*, 598 F.2d 321 (2d Cir. 1979); *United States v. Schutterle*, 586 F.2d 1201 (9th Cir. 1978); *United States v. Marine Midland Bank*, 585 F.2d 36 (2d Cir. 1978).

12. A clear explanation of the relative merits of the "general civil purpose" test versus the "summons-by-summons" test adopted in *Genser* is provided in Note, "The Institutional Bad Faith Defense to the Enforcement of IRS Summonses," 80 Column.L.Rev. 621, 626–628 (1980).

13. For a general overview of IRS internal procedures and guidelines relating to joint investigations, see Internal Revenue Manual, ch. 9400 §§ 9324.2, 9324.3, 9324.31; ch. 4500, §§ 4565.3, 4565.31, 4565.32, 4565.42 (CCH 1979).

mons was issued by Schreiber. The IRS adopted the view that no active civil investigation need be ongoing at the time the summons was issued, because the results of the solely criminal investigation would have an "impact" upon the civil end of the IRS investigation.

This position is clearly at odds with the *Genser* "summons-by-summons" approach, because it inherently assumes that a "civil purpose" existed for the summons issued by Schreiber. If this Court were to accept the IRS's viewpoint on the conduct of its so-called joint investigation, then Dahlstrum could never prove the absence of civil tax consequences in his investigation. The dangers alluded to in *Genser* would then become very real. Thus, the appropriate and equitable standard to apply in analyzing the issuance of the summons by Schreiber is the *Genser* approach, which seeks to find a "link between each summons and the proffered civil purpose." 595 F.2d at 151.

In applying *LaSalle* and *Genser* to the facts of this case, this Court in effect employs a two-prong test. The first prong probes into the existence of a "civil purpose" in the issuance of the summons to Dahlstrum. The second prong focuses upon whether the IRS was "information-gathering" solely to aid a criminal prosecution.

The absence of a civil purpose is made abundantly clear by the fact that the IRS's investigation here was fraught with deviations from normal operating procedure. IRS guidelines regarding joint investigations contemplate the presence of a cooperating civil revenue officer and spell out at great length the need for close cooperation between the criminal Special Agent and the cooperating civil revenue officer. *See generally*: I.R. Manual, ch. 4500, § 4565.32; ch. 9400, §§ 9324.2, and 9324.31 (CCH 1979). A

cooperating revenue agent and Special Agent are to "continually and carefully review all taxpayer activity having an impact on the civil aspects." I.R. Manual, ch. 4500, § 4565.42(4) (CCH 1979). The Special Agent should also be "sufficiently familiar with the examination or collection features of the case." I.R. Manual, ch. 9300, § 9324.-2(7)(a) (CCH 1979).

Yet, in the IRS investigation of the defendant, a cooperating civil revenue agent was not assigned until more than three months *after* the issuance of the summons in question. Special Agent Schreiber's refusal to discuss the civil aspects of the case becomes understandable because, concentrating solely on his criminal investigation he was completely ignorant of the civil status of the case and therefore unable to comply with the I.R. Manual guidelines.

In addition, the presence of other deviations prompted the Court to conclude that the IRS has failed to demonstrate a civil purpose for the issuance of the summons: the inability during this period to locate any civil revenue officer knowledgeable as to the defendant's civil tax status; the fact that over a year lapsed between the time the matter was referred to the criminal Intelligence Division and when a cooperating civil revenue agent was finally assigned to the case; and the further fact that the original referral form sent to the Intelligence Division reflects that a cooperating civil agent was never requested.

A finding to the effect that there was an absence of a civil purpose for the summons is not sufficient to establish a *LaSalle* violation here. This Court still must find that the summons was issued for the purposes of gathering evidence for a criminal prosecution.[14] Viewing the IRS investigation from

**14.** The gathering of evidence for other governmental departments, such as the Department of Justice, should not be restricted solely to situations where, for example, a U. S. Attorney has made a specific request that a summons be issued. The Supreme Court in *LaSalle* clearly recognized that the *Powell* elements of good-faith were not meant to be exclusive and that future cases would raise the need to prevent "other forms of agency abuse." 437 U.S. at

317–318, 98 S.Ct. at 2368. This case presents a form of IRS "institutional bad faith" which does not appear to have arisen in any of the cases to date, this Court believes it should not limit its focus to specific instances of a direct contact between the IRS and another governmental agency. Indeed, the facts of this case strongly support a more flexible approach in dealing with "information-gathering" by the IRS.

hindsight permits this Court to take cognizance of certain facts which normally may not be present at a *LaSalle* hearing conducted at the time the summons is issued. Specifically, it is noted that the defendant was an attorney who at one time represented a reputed notorious underworld figure. Dahlstrum was, by his own admission, a chronic late filer of income tax returns who paid substantial civil penalties for the poor handling of his personal affairs. Also, the evidence adduced at this Court's *LaSalle* hearing overwhelmingly points to the fact that the IRS's investigation was not to determine and collect taxes from the defendant, but rather to build a criminal case against an attorney who at one time may have represented somewhat notorious clients.[15]

■ These observations, coupled with the subsequent indictment and prosecution, lead this Court to infer from the evidence presented that the IRS was gathering evidence to aid a solely criminal investigation of the defendant and that the issuance of the summons was not to aid the determination and collection of taxes from the defendant, but rather to build a criminal case against him, in violation of the strictures of *LaSalle.*

## IV. DISMISSAL OF THE INDICTMENT

In concluding that the IRS was acting in "institutional bad-faith" when it issued a summons to Dahlstrum's accountant, this Court has before it the choice of ordering either suppression of the evidence obtained by the illegal summons or dismissal of the indictment. The need to employ this Court's supervisory powers to remedy governmental misconduct was powerfully expressed by Mr. Justice Brandeis in his famous dissenting opinion in *Olmstead v. United States,* 277 U.S. 438, 471–485, 48 S.Ct. 564, 570–575, 72 L.Ed. 944 (1928):

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

The government's misconduct here does not simply involve the question of an illegal search and seizure. Rather, the IRS's unauthorized and "institutional bad faith" use of the authority provided to it by the Congress under § 7602 constitutes a form of agency abuse and governmental misconduct tantamount to the type of prejudice which necessarily results in judicial condemnation of prosecutorial misconduct. *See: United States v. Samango,* 607 F.2d 877 (9th Cir. 1979); *United States v. Thompson,* 576 F.2d 784 (9th Cir. 1978); *United States v. Owen,* 580 F.2d 365 (9th Cir. 1978). In addition, it is clear that the scope of the inquisitorial

---

**15.** The Supreme Court in *LaSalle* made clear that the motives of a single agent are not dispositive in determining the issue of IRS "institutional bad faith." *LaSalle* at 314–15, 98 S.Ct. at 2366. However, Mr. Justice Blackmun stated that examination of agent motive could be relevant to evaluate the good faith elements of *Powell* in situations where the summons was issued to harass the taxpayer. *Id.* at 316 n. 17, 98 S.Ct. at 2367.

In this case, an inference of harassment might be drawn from the evidence which indicates that Dahlstrum always paid the civil penalties assessed for his dilatory conduct in filing income tax returns. While the IRS may have intended to harass Dahlstrum because of his association with reputed mobsters, this Court's decision does not, however, rest solely upon such a finding. Rather, the "institutional bad faith" found to have occurred in this case, results from a cumulation of IRS deviations in its investigation of the defendant, including but not limited to the observations stated above.

power granted the IRS Commissioner under § 7602 is not unlike that vested in federal grand juries. *United States v. Cortese*, 540 F.2d 640, 642–643 (3d Cir. 1976); *United States v. Matras*, 487 F.2d 1271, 1274 (8th Cir. 1973). *See also: United States v. La-Salle National Bank*, 437 U.S. 298, 313 n. 15, 98 S.Ct. 2357, 2365 n. 15, 57 L.Ed.2d 221 (1978); *United States v. Bisceglia*, 420 U.S. 141, 147, 95 S.Ct. 915, 919, 43 L.Ed.2d 88 (1975); *United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964). Thus, it follows that IRS abuse of this civil inquisitorial power by its "institutional bad faith" failure to operate within the parameters of *LaSalle* and *Genser* approaches a level of flagrant prosecutorial misconduct which justifies the invocation and exercise of this Court's supervisory powers to remedy this misconduct.[16]

■ Dismissal of an indictment is required only in flagrant cases of government overreaching. *See: United States v. Thompson*, 576 F.2d 784, 786 (9th Cir. 1978); *United States v. Roberts*, 481 F.Supp. 1385 (C.D.Cal.1980). Here, dismissal is mandated by the overwhelming evidence of the IRS's flouting of the civil summons authority granted to it by the Congress. The result has been to subject the defendant to a criminal prosecution, which other extrinsic facts would suggest was perhaps unwise and selective. While dismissal is a strong remedy to apply, it serves as the only effective deterrent when a case reaches the criminal trial phase. This Court understands and respects the difficulties faced by the IRS in the performance of its assigned tasks. However, in view of the circumstances of this case, this Court feels compelled to dismiss the indictment with preju-

dice in order to preserve the interests of a taxpayer defendant subjected to this type of governmental misconduct, even though fueled only by "institutional bad faith" and not any personal bad faith.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), and the Clerk shall serve copies hereof upon all counsel of record herein.

LET JUDGMENT BE ENTERED ACCORDINGLY.

## JUDGMENT

The Court having made and entered its Decision and Order containing its findings of fact and conclusions of law herein, and good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Indictment herein, and each and every count thereof, is dismissed with prejudice.

2. Defendant is acquitted of and from any and all counts and charges contained in said Indictment.

3. Defendant's appearance bond and its obligors are exonerated and defendant and his bail are released.

4. The Clerk shall serve copies of this Judgment on all counsel of record herein.

The *Payner* decision does not alter the result reached in this case because the IRS misconduct here tainted not only the evidence obtained from the illegal summons, but also spread contagiously to contaminate the entire criminal prosecution ultimately brought against the defendant. This Court, herein, does not believe that *Payner* should be read to limit the sound exercise of its supervisory powers when there so clearly exists a basis in fact and law for doing so.

**16.** Following this Court's oral ruling in this matter, the Supreme Court in *United States v. Payner*, —— U.S. ——, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), discussed the supervisory powers of the federal courts to suppress evidence seized illegally from a third party. The Court held that a federal court is not permitted to suppress the use of evidence unlawfully obtained from a party not before that court because the defendant could not satisfy the standing requirements of the Fourth Amendment. *See: Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).