**UNITED STATES of America and Donald Jackson, Special Agent, Petitioners/Appellees,**

v.

**Charles H. STUCKEY et al., Respondents,**

and

**Morry Weinstein, Intervenor-Appellant.**

**No. 79–4691.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 16, 1980.

Decided June 1, 1981.

Rehearing and Rehearing En Banc Denied Aug. 28, 1981.

John M. Youngquist, San Francisco, Cal., for petitioners/appellees.

Daniel Ross, Washington, D. C., argued, for respondents; Gilbert E. Andrews, Washington, D. C., on brief.

Before MERRILL and SKOPIL, Circuit Judges, and WYATT,* District Judge.

SKOPIL, Circuit Judge:

## INTRODUCTION

Weinstein appeals a district court's order enforcing administrative tax summonses issued pursuant to 26 U.S.C. § 7602. Weinstein failed in district court to prove his contention that the summonses were issued in bad faith in aid of a criminal prosecution. On appeal he argues that he failed because the district court improperly denied his re-

quest for discovery and abused its discretion in limiting the evidentiary proceedings.

We affirm.

## FACTS

Morry Weinstein is a tax attorney who was arrested along with others by agents of the Drug Enforcement Administration (DEA) for alleged possession of hashish. The agents seized drugs, cash and various bank receipts. The DEA immediately notified the Internal Revenue Service (IRS) of the arrests.

Weinstein was indicted and pleaded not guilty to the drug offense. Prior to trial certain evidence unrelated to Weinstein was ordered suppressed. Weinstein's indictment was dismissed without prejudice. After dismissal of Weinstein's indictment, the Assistant U. S. Attorney, acting pursuant to 26 U.S.C. § 6103(i), obtained an *ex parte* order that allowed him access to information gathered by the IRS in its investigations.

Weinstein was interviewed by an IRS revenue agent after his drug arrest. The revenue agent referred the case to the Criminal Investigation Division of the IRS because of certain allegedly false statements made by Weinstein. Weinstein claimed to have filed tax returns for 1975 and 1976 but the revenue agent found no record of those returns.

The investigation was assigned to Thomas Utaski, a special agent, who issued all but one of the summonses at issue in this appeal. A second special agent, Donald Jackson, later took over the investigation and issued the other summons. The summonses were directed to various individuals and banks and requested Weinstein's financial records.

Weinstein exercised his right provided by 26 U.S.C. § 7609 by requesting that the third parties summoned not provide infor-

---

* Honorable Inzer B. Wyatt, Senior United States District Judge of the Southern District of New York, sitting by designation.

mation. This action was commenced in district court when Jackson filed a petition to enforce the summonses. Weinstein was granted permission to intervene in the enforcement action.

Weinstein raised several affirmative defenses in opposition to enforcement. He argued that the IRS issued the summonses to harass him and to aid the DEA in its non-tax criminal investigation. He submitted declarations in support of his arguments. The government filed declarations of five agents and officers in support of enforcement. The district court concluded that Weinstein raised sufficiently serious questions to warrant an evidentiary hearing. The hearing was to "be limited to an examination of the persons who have offered affidavits [sic] in support of the petition." The court stated that based on its observations at that hearing, it would determine if further inquiry would be conducted and whether Weinstein would be allowed limited discovery. Weinstein's request for pre-hearing discovery was denied.

The hearing was held as scheduled. Weinstein's witnesses were available to support his affirmative defenses. The district court limited the hearing by allowing testimony from only the two summoning agents. Weinstein was allowed to conduct full cross-examination of Jackson but was interrupted before completing cross-examination of Utaski. The district court at that point stated:

"I am going to cut the hearing off at this particular juncture. The purpose of the hearing is to sift out the evidence, if there is any, of harassment or improper purpose that can be substantiated to avoid dilatory or discovery matters and to see whether or not the purpose of the summons[es] were to assist the government. And we have had both the people on the stand that have issued the summons[es] and I find no bad faith on their part, nor any purpose to assist the government in the drug case. And, thereby the court orders the govern-

ment's Petition for Enforcement of Summons[es] is granted".

Weinstein objected to the termination of the proceedings and requested that he be allowed to make an offer of proof. The court granted that request.

In his offer of proof Weinstein contended that he could have demonstrated certain "extraordinary aberrations from usual IRS administrative procedure" from which the court could have reasonably inferred institutional bad faith. Weinstein argued that to achieve that goal he should have been allowed to question persons who submitted declarations and to question two other IRS employees with knowledge of the investigation.

The court, in enforcing the summonses, stated that it considered all the declarations submitted as well as the testimony of the agents. The court concluded that the summonses were issued in good faith since the IRS was not acting to gather information for the Department of Justice.

A motion to stay enforcement of the order was denied by the district court. This court, however, stayed the enforcement pending appeal. Our jurisdiction is predicated on 28 U.S.C. § 1291.

## DISCUSSION

■ The proceeding to enforce an IRS summons is an adversary proceeding. *United States v. Asay*, 614 F.2d 655, 661 (9th Cir. 1980). The taxpayer is entitled to challenge the summonses on any appropriate ground. *United States v. Freedom Church*, 613 F.2d 316, 319 (1st Cir. 1979). The taxpayer, however, carries a heavy burden of convincing the district court to deny enforcement. The taxpayer must, in fact, be able to provide a minimal amount of evidence just to entitle him or her to an evidentiary hearing. *E. g., United States v. Popkin*, 623 F.2d 108 (9th Cir. 1980).

We are asked on this appeal to determine if the trial court erred in denying pre-hearing discovery and in limiting the scope of

the evidentiary proceeding. We must also review the district court's decision to enforce the IRS summonses.

Our task is one of balancing competing interests.[1] On one hand is the government's interest in summary proceedings designed to expedite tax collection. On the other hand is the taxpayer's right to protection from the improper use of the Internal Revenue Service's summons powers. We are aided in our task by an abundance of recently decided appellate cases[2] and by several excellent district court opinions.[3]

## I. Standard of Review

The district court has discretionary authority to limit the scope of an evidentiary hearing and to deny discovery in a summons enforcement proceeding. *E. g., United States v. National Bank of South Dakota*, 622 F.2d 365, 367 (8th Cir. 1980). The Federal Rules of Civil Procedure apply to such proceedings and rule 81(a)(3) allows for such flexibility, particularly in proceedings which are intended to be summary in nature. *United States v. Church of Scientology of California*, 520 F.2d 818, 821 (9th Cir. 1975). Our review of the district court's procedural rulings is limited to determining if the court abused its discretion.

We are less clearly guided as to our review of the district court's conclusion in this case that the summonses were not issued in bad faith. *See United States v. LaSalle National Bank*, 437 U.S. 298, 319, n.21, 98 S.Ct. 2357, 2368, n.21, 57 L.Ed.2d 221 (1978) (noting the discussion by several circuit courts of the factual and legal issues involved in enforcement proceedings but declining to resolve the standard of review question). This circuit has recently adopted the clearly erroneous standard for review of the district court's decision to deny enforcement of an IRS summons. *United States v. Goldman*, 637 F.2d 664, 666 (9th Cir. 1980). *See also United States v. Asay*, 614 F.2d 655, 661 (9th Cir. 1980); *United States v. Coopers & Lybrand*, 550 F.2d 615 (10th Cir. 1978). *Cf. United States v. Cortese*, 614 F.2d 914 (3d Cir. 1980) (rejecting the clearly erroneous and adopting a *de novo* review). We will not disturb the trial court's decision to enforce the summonses in this case unless the finding of good faith was clearly erroneous or if the district court applied an incorrect legal standard in reaching its decision. *LaSalle, supra*, 437 U.S. at 319, n.21, 98 S.Ct. at 2368, n.21; *United States v. Zack*, 521 F.2d 1366, 1369 (9th Cir. 1975).

## II. Pre-Hearing Discovery

Weinstein may have failed in his burden of proof because the district court denied his request for pre-hearing discovery. We recognize the anomaly of placing a burden

1. *See* Note, *The Institutional Bad Faith Defense to the Enforcement of IRS Summons*, 80 Columbia L.R. 621 (1980) and Note, *Discovery in the IRS Summons Enforcement Proceedings: Less Certain than Death and Taxes*, 31 U.Fla.R. 321 (1979).

2. *E. g., United States v. Harris*, 628 F.2d 875 (5th Cir. 1980); *United States v. Sherman*, 627 F.2d 189 (9th Cir. 1980); *United States v. Popkin*, 623 F.2d 108 (9th Cir. 1980); *United States v. National Bank of South Dakota*, 622 F.2d 365 (8th Cir. 1980); *United States v. Southern Tanks, Inc.*, 619 F.2d 54 (10th Cir. 1980); *United States v. Omohundro*, 619 F.2d 51 (10th Cir. 1980); *United States v. Cortese*, 614 F.2d 914 (3d Cir. 1980); *United States v. Asay*, 614 F.2d 655 (9th Cir. 1980); *United States v. Freedom Church*, 613 F.2d 316 (1st Cir. 1979); *United States v. Equitable Trust Co.*, 611 F.2d 492 (4th Cir. 1979); *United States v. Garden State Na-

tional Bank*, 607 F.2d 61 (3d Cir. 1979); *United States v. Serubo*, 604 F.2d 807 (3d Cir. 1979); *United States v. Genser (Genser III)*, 602 F.2d 69 (3d Cir.), *cert. denied*, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979); *United States v. Chase Manhattan Bank*, 598 F.2d 321 (2d Cir. 1979); *United States v. Genser (Genser II)*, 595 F.2d 146 (3d Cir. 1979); *United States v. Chemical Bank*, 593 F.2d 451 (2d Cir. 1979); *United States v. Noall*, 587 F.2d 123 (2d Cir. 1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979); *United States v. Marine Midland Bank of New York*, 585 F.2d 36 (2d Cir. 1978).

3. *E. g., United States v. Dahlstrum*, 493 F.Supp. 966 (C.D.Cal.1980); *United States v. Ryan*, 485 F.Supp. 1285 (S.D.N.Y.1980); *United States v. Ladd*, 471 F.Supp. 1150 (N.D.Tex.1979).

of proof upon the taxpayer and then denying access to what may be the very information needed to meet that burden. *See United States v. Serubo*, 604 F.2d 807, 812 (3d Cir. 1979). Should we determine that discovery was improperly denied in this case, a proper remedy would be to remand for discovery and an evidentiary hearing at which Weinstein could present the fruits of that discovery.

In *Church of Scientology*, we held that the district court has great discretion to restrict or deny discovery. *See also United States v. Southern Tanks, Inc.*, 619 F.2d 54 (10th Cir. 1980); and *United States v. Ladd*, 471 F.Supp. 1150 (N.D.Tex.1979). Discovery in a summary enforcement proceeding is the exception rather than the rule. *Church of Scientology, supra*, at 824.

The Supreme Court in *LaSalle* did not address the taxpayer's right to discovery. Nevertheless, the Third Circuit has interpreted *LaSalle* to suggest guidelines for discovery. *E. g., United States v. Serubo*, 604 F.2d 807, 812–13 (3d Cir. 1979); *United States v. Genser (Genser II)*, 595 F.2d 146, 152 (3d Cir. 1979), *later appeal*, 602 F.2d 69 (3d Cir.), *cert. denied*, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979). At a minimum, the taxpayer is entitled to discover the identities of the investigating agents, the date the investigation began, the dates of all summonses issued, and the nature of any contacts between the investigating agents and the Department of Justice. *Genser II, supra* at 152. Further discovery, carefully tailored to meet the purpose of the inquiry, may be permitted at the court's discretion. *Id.*

■ Some courts routinely allow limited pre-hearing discovery in enforcement proceedings. *E. g., United States v. Garden State National Bank*, 607 F.2d 61 (3d Cir. 1979); *Genser II, supra* at 152. Other courts allow limited discovery only if the taxpayer can make a substantial preliminary showing of abuse or wrongdoing. *E. g., United States v. Southern Tanks, Inc.*, 619 F.2d 54 (10th Cir. 1980); *United States v. Chase Manhattan Bank*, 598 F.2d 321 (2d Cir. 1979); *United States v. Marine Midland Bank of New York*, 585 F.2d 36 (2d Cir. 1979). This circuit has adopted the latter procedure. *Church of Scientology, supra*. Pre-hearing discovery is not generally mandated. If taxpayer's allegations are sufficient, a limited evidentiary hearing is conducted. Discovery is then warranted if the trial court is not convinced that the summonses were issued for a proper purpose. *See also United States v. Salter*, 432 F.2d 697 (1st Cir. 1970) and *United States v. McCarthy*, 514 F.2d 368 (3d Cir. 1975). Therefore the district court did not abuse its discretion in denying Weinstein's request for prehearing discovery.

III. The Evidentiary Hearing

■ Weinstein was able to make a sufficient showing to persuade the district court to conduct a limited evidentiary hearing. The purpose of the evidentiary hearing is to sift out those rare cases where an improper purpose can be substantiated to determine if the taxpayer should be permitted discovery. *United States v. Sherman*, 627 F.2d 189, 192 (9th Cir. 1980).

■ The government bears an initial burden of showing at the evidentiary hearing that the summonses were issued for a proper civil purpose. *E. g., United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–255, 13 L.Ed.2d 112 (1964); *United States v. Garden State National Bank*, 607 F.2d 61, 71 (3d Cir. 1979). In this case the government was able to make that *prima facie* showing. The burden then shifted to the taxpayer to offer proof to rebut the government's case. We must determine what the taxpayer must prove.

This circuit addressed this issue in *United States v. Church of Scientology*, 520 F.2d 818 (9th Cir. 1975). In that case, we determined that a taxpayer had been improperly denied an evidentiary hearing. The case was remanded and the trial court ordered

to conduct a "limited evidentiary hearing to determine whether further inquiry into the Service's purposes by way of discovery [was] warranted". *Id.* at 825. The scope of the hearing was left to the discretion of the district court although it was conceived to include at least cross-examination of the summoning agents.

In *United States v. Zack*, 521 F.2d 1366 (9th Cir. 1975), this circuit decided that a taxpayer seeking to defeat enforcement must show that the summonses were not issued for any legitimate purpose. We recognized that this burden, as a practical matter, was quite hard to sustain. *Id.* at 1368. Even the co-existence of an improper purpose would not prevent enforcement of the summons if the existence of a legitimate purpose was not rebutted by the taxpayer.[4]

 Since our decisions in *Church of Scientology* and *Zack*, the Supreme Court decided *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). *LaSalle* reaffirmed two important limitations on the enforceability of IRS summonses. First, the summonses must be issued before the IRS recommends to the Department of Justice that a criminal prosecution be undertaken. Second, prior to such a recommendation, the IRS "at all times must use the summons authority in good-faith pursuit of the congressionally authorized purposes of § 7602." *LaSalle*, 437 U.S. at 318, 98 S.Ct. at 2368.

This second prerequisite requires the IRS to maintain two standards. First, "the Service must [not] abandon in an institutional sense ... the pursuit of civil tax determination or collection." 437 U.S. at 318, 98 S.Ct. at 2368. This standard focuses on the institutional posture of the Service instead of on the motivation of individual agents.

Second, the IRS must meet the standards of good faith enunciated in *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–255, 13 L.Ed.2d 112 (1964). *LaSalle* specified that the IRS violates the *Powell* good faith standard if it is shown that the IRS became "an information-gathering agency for other departments, including the Department of Justice. ..." 437 U.S. at 317, 98 S.Ct. 2368. *See also United States v. First National Bank of Atlanta*, 628 F.2d 871, 874 (5th Cir. 1980).

Weinstein sought to show an "extraordinary set of facts and circumstances" that would demonstrate that the IRS institutionally did not have a valid civil tax collection purpose and that the IRS was acting as an information gathering agency for the Department of Justice. Weinstein argues that he was denied an opportunity to meet his burden of proof by the trial judge's premature termination of the evidentiary hearing.

[11] Our review of the transcript of the evidentiary hearing satisfies us that the trial court's decision to limit the evidentiary hearing was not an abuse of discretion. There was ample testimony from the two summonsing agents that the procedures followed in the investigation were not unusual and were directed toward determining Weinstein's tax liabilities. The good faith of the IRS was irrebuttably demonstrated by Agent Utaski's testimony that he found no record of the filing of Weinstein's 1975 and 1976 tax returns. Although there was some communication between the IRS and the DEA, the information given to the DEA was pursuant to a proper court order. Both

---

4. The existence of a general civil purpose for the tax investigation as a whole does not end a judicial inquiry. *United States v. Genser (Genser II)*, 595 F.2d 146 (3d Cir. 1979). If such a finding were dispositive, the taxpayer would face the impossible burden of disproving what has already been postulated by *LaSalle*, the congruency of criminal and civil liability. *Genser II, supra* at 150–51. A district court may, if it chooses, examine each summons. If any one summons was issued solely for an improper purpose, it will not be enforced "even in the face of an overwhelming civil purpose for the investigation as a whole." *Id.* at 150. *Cf. United States v. Omohundro*, 619 F.2d 51 (10th Cir. 1980) (evidence that summonses were issued for proper purpose was sufficient to warrant enforcement even though IRS admitted that the information may be used in a criminal context).

agents testified that DEA did not instruct them to issue summonses or gather information. Even if Weinstein was able to show an improper purpose, it would not be enough to conclude that the IRS had "become an information-gathering agency for ... the Department of Justice." *LaSalle, supra* 437 U.S. at 317, 98 S.Ct. at 2368.

Weinstein argues that the trial court incorrectly viewed the motivation of the agents as determinative of the good faith of the IRS. We disagree. There is no indication that the trial court examined only the motivation of the agents in reaching its conclusion.[5] There was sufficient evidence in the testimony of the agents for the trial court to conclude that the IRS had followed its procedures, and that the IRS as an institution was properly pursuing civil tax collection.

## IV. Enforcement of the Summonses

 We must now determine if there exists a sufficient basis for the trial court's conclusion that the summonses were issued for a proper purpose. Our review is limited to determining if the trial court's decision was clearly erroneous. *United States v. Goldman*, 637 F.2d 664 (9th Cir. 1980).

 We hold that the trial court's decision to enforce the summonses was not clearly erroneous. There was sufficient evidence to support a finding that a valid civil purpose existed for the issuance of the summons.

## CONCLUSION

The district court did not abuse its discretion by denying discovery or by limiting the scope of the evidentiary hearing. The trial

court did not misapply the directives of the Supreme Court in *LaSalle*. Although the hearing was limited to the examination of the summonsing agents, the trial judge determined that the IRS issued the summonses in pursuit of a legitimate purpose. The decision to enforce the summonses was not clearly erroneous.

The judgment of the district court is affirmed.

MERRILL, Circuit Judge, concurring:

I concur in Judge Skopil's opinion, and agree that taxpayer has not met his burden of showing such a likelihood of bad faith on the part of IRS as would warrant the granting of discovery and further hearing.

I would add that where, as here, preliminary investigation suggested that the taxpayer, known to be engaged in income producing professional activity, had for two years failed to file income tax returns, the IRS, under any rational view of its function, was obligated to inquire further as to taxpayer's liability. A recognition by the revenue agents of this institutional obligation could hardly be other than in good faith. Here, Agent Utaski testified that he had checked with the Fresno Service Center of the IRS to ascertain whether taxpayer had filed returns for 1975 and 1976, and had been told that there was no record of such filing. Further, he had been told by Agent Gibson in San Rafael that Gibson had no record of any returns for 1975 and 1976 having been filed by taxpayer. This may be hearsay as to the fact of filing, but it is competent evidence of Utaski's good-faith belief that no returns had been filed for those years.[1]

As to the institutional good faith of the IRS, I would note that when taxpayer is

---

5. The agents' motive may be relevant, however, when harassment is alleged. *E. g., United States v. Cortese*, 614 F.2d 914, 921, n.11 (3d Cir. 1980). Harassment was alleged in this case. We are satisfied, however, with the government's explanation that multiple summonses were issued to correct defects in the original summonses.

1. I do not draw the same conclusion as does Judge Wyatt in his dissent that possession of copies of tax returns for 1975 and 1976 supplied by taxpayer's attorney and purportedly filed in San Rafael should have dispelled all questions and doubts that normally arise from a taxpayer's failure to file. In the first place, I do not find in the record any evidence or government concession that the original re-

under investigation for trafficking in drugs, the prospect of guilt carries with it the prospect of unreported income. The IRS, for its own purposes, has as much interest in the question of taxpayer's drug connections as has the DEA, and as much occasion to wish to check his financial records. It cannot be said that once a taxpayer is under investigation by the DEA, the pursuit of information by IRS suggests bad faith.[2] Nor does it suggest bad faith to me for IRS to indicate its willingness to share its information with DEA, or to respond to a court disclosure order. Such sharing of information under the circumstances that exist here is perfectly proper and does not constitute IRS an information gatherer for DEA rather than for itself. The statutory provision for disclosure compelling such sharing when ordered by a court makes this clear.

WYATT, District Judge (dissenting):

I am not able to agree with the decision to affirm the order of enforcement of the IRS summonses. I therefore respectfully dissent from that decision. The procedure followed in the District Court was in my opinion wrong and was contrary to the controlling guidance in *United States v. Church of Scientology, etc.*, 520 F.2d 818 (9th Cir. 1975); the procedural errors of the District Court—particularly the refusal to permit appellant Weinstein to present evidence—denied appellant elementary due process and violated his constitutional rights. As a result of the procedural errors below no factual record was made sufficient to enable either the District Court or this Court to determine whether the summonses should be enforced or not. Accordingly, I would reverse the order appealed from and

would remand with instructions to grant appropriate discovery to appellant, to afford appellant an opportunity to present evidence at an adequate adversary hearing, and to determine on a more complete record whether the summonses should be enforced.

Not only was the action of the Court below procedurally wrong; that action also violated substantive law principles repeatedly declared by the Supreme Court.

1.

Since the record before us is deficient as indicated, it is not possible to recite the facts with complete confidence. Based on what we have, including offers of proof, representations of counsel in briefs, and the transcript of the September 21, 1979, hearing before the District Court, the chronological development appears to have been as follows:

Appellant Weinstein is an attorney, apparently specializing in tax matters. He lived in and practiced law in Mill Valley, a town in Marin County, California.

So far as appears, Weinstein filed his own tax returns regularly through the year 1973.

Weinstein did not *timely* file tax returns for 1974, 1975, and 1976.

Sometime "in early 1977" he received by mail "delinquency notices" from the Fresno Service Center of IRS as to his 1974, 1975, and 1976 returns (T 84; "T" references are to pages of the transcript of the September 21, 1979, hearing). According to him, "shortly thereafter ... in March of 1977" he was called on the telephone by Agent Norton Gibson of the San Rafael District Office about the same missing returns (T 85). It seems natural that IRS should deal

turns for those years ever had turned up in IRS files. Further, it should in any event be noted that there is no claim that these returns were filed until after demand for them had been made and the suspicions, which failure to file understandably created, had already arisen.

**2.** A different rule applies in cases such as *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), and

*Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), where the IRS has requested the Department of Justice to proceed criminally in a *tax* matter. Where the criminal investigation is for a nontax crime, however, I find no authority that precludes the two investigations from proceeding contemporaneously, or proscribes a sharing of the information pursuant to a court disclosure order.

with Weinstein through its San Rafael office. Weinstein was in Mill Valley in Marin County, close to San Rafael, also in Marin County. Both towns are only a few miles north of San Francisco.

According to Weinstein (T 85), he explained to Agent Gibson that he had been prevented from filing the returns because he was involved in "massive litigation" but that he had "tentatively computed" the results for the years in question and that no tax was due; Gibson accepted this explanation and told him that when the returns were filed, they should be filed with him (Gibson).

In the record is a copy of a letter from Weinstein to Agent Gibson showing that Weinstein, under date of April 29, 1977, did send to Agent Gibson the original of his tax return for 1974; how the 1974 return was sent does not appear.

In the record is a copy of a letter from Weinstein to Agent Gibson showing that Weinstein, under date of June 14, 1977, did send to Agent Gibson the originals of his tax returns for 1975 and 1976. According to the returns no tax was payable.

After the 1974, 1975, and 1976 returns were sent to Agent Gibson in San Rafael, Weinstein heard nothing more about them from Agent Gibson, or from anybody else in IRS, and could have reasonably assumed that they had been duly filed with and received by IRS.

There seems to be nothing unusual or irregular in Weinstein filing his 1974, 1975, and 1976 returns in the San Rafael local office of IRS. It was Agent Gibson of that office who telephoned him about those returns and who asked that they be filed with him in San Rafael.

There was an IRS Service Center serving Northern California internal revenue districts; this was the Fresno Service Center. Fresno is some 170 miles southeast of San Francisco, and farther than that from Marin County. The Internal Revenue Code (26 U.S.C. § 6091(b)(1)(A)) provides that individual returns shall be made to the Secretary in the internal revenue district where the individual has his legal residence or at the service center, as the Secretary by regulations may designate. It does not appear where the regulations designate that individual returns for the relevant years be filed, except that some returns (handcarried) were directed to be filed "with any person assigned the administrative supervision of an area, zone or *local office* ... within the internal revenue district" 26 C.F.R. 1.6091–2(d)(1); (emphasis supplied). In any event, it is difficult to fault a taxpayer who files his returns where requested or directed by the Internal Revenue Agent to whom his matter had been assigned within IRS itself.

2.

Weinstein was arrested by DEA officers on August 1, 1978, and four others were arrested on the same date. Their involvement is said to have been with 500 pounds of hashish. Where, at what time, and in what order they were arrested, does not appear. The government tells us (Brief, p. 2): "The Drug Enforcement Administration (DEA) agents making the arrests seized $12,690 in currency and savings account passbooks and receipts for deposits in excess of $80,000, all relating to accounts owned by the taxpayer." According to appellant (Reply Brief, p. 11), the currency seized was not taken from him but from Martinez, another of those arrested; Martinez was not arrested with Weinstein and was not known to Weinstein; and it was the currency seized from Martinez which was later suppressed as evidence by the District Court (Orrick, J.) as seized in violation of constitutional rights of Martinez. At least some of the bank deposit records were seized from an automobile of Weinstein but his counsel tells us (Reply Brief, p. 11) that he explained at the time that the bank records were trust accounts for clients and also explained the sources of the deposit funds. No drugs were seized from Weinstein.

DEA notified IRS of the arrests immediately and must have asked for the cooperation of IRS at least as far as Weinstein was concerned. It would seem that DEA went to IRS in order to secure help from IRS in the criminal drug prosecution of Weinstein and the others. IRS was ready and willing to give such help and Revenue Agent Caramucci was assigned at once; he and two other IRS agents interviewed Weinstein on the day of his arrest.

In the interview on the day of his arrest (August 1, 1978), Weinstein told the IRS agents that he had filed returns late for the years 1974, 1975 and 1976; that he had filed those returns with Revenue Agent Gibson at San Rafael by request of Agent Gibson to whom the case had been assigned; that he was working on his return for 1977; that there were difficulties in securing necessary partnership papers for this return; and that no tax was shown as due on the 1975 and 1976 returns as filed with Agent Gibson.

There is confusion in the papers before us as to the extent to which the year 1974 was involved in the IRS investigation of Weinstein. The District Court did nothing to clear up this confusion. It is at least a plausible explanation that the IRS was anxious to extend its help to the non-tax criminal prosecution of Weinstein on drug charges; that an easy excuse for an IRS criminal investigation was a claim of failure by Weinstein to file income tax returns for 1974, 1975, and 1976; that only a cursory and superficial attempt was made to verify Weinstein's statement that he had filed those returns with Agent Gibson at San Rafael as directed by Agent Gibson; and that initiation of an IRS criminal investigation could be based on asserted false statements by Weinstein that he had filed 1974, 1975, and 1976 returns. When very soon, as will appear, the 1974 original return was located in the IRS records—thus confirming the truth of what Weinstein had said—the year 1974 had to be dropped as an excuse and attention focused only on 1975 and 1976. In the beginning, however, 1974 was one of the years covered by the IRS investigation.

From papers submitted to this Court on a motion for a stay pending this appeal, we learn that on August 1, 1978—the day of his arrest on the drug charges—Weinstein also told the IRS agents of his deposit in a bank of a $5,000 retainer check; and that on August 4, 1978—three days later—DEA agents served a summons on that bank for a copy of the described retainer check. This would suggest that IRS was from the outset telling the drug criminal prosecution team in DEA and the United States Attorney's office everything IRS was learning from and about Weinstein. While it is denied for DEA that the $5,000 check information came from IRS, other circumstances cast doubt on the denial and, in any event, further exploration by the Court below of the facts was clearly called for.

On August 8, 1978, Revenue Agent Caramucci made a report asking that the Weinstein matter be referred to the Criminal Investigation Division of IRS. The excuse for this seems to have been that no record of the filing of returns by Weinstein for 1974, 1975 and 1976 could be found at the Fresno Service Center and that it might be an instance of a willful failure to file. No effort seems to have been made by IRS to inquire of Agent Gibson what he had done with the returns said to have been filed with him. Indeed, at no time to date has IRS produced any statement, declaration, or affidavit from Agent Gibson and Weinstein was not allowed to obtain his testimony below.

On August 16, 1978, a grand jury returned an indictment on drug charges against Weinstein and four others arrested on the same charges. The file number is CR-78-372-WHO and the indictment was assigned to Judge Orrick. Assistant United States Attorney Mueller was in charge of the prosecution.

On August 18, 1978, Weinstein pleaded not guilty to the indictment.

In early October 1978—in any event before October 4—the Criminal Investigation

Division of IRS was considering whether to accept the referral of the Weinstein matter and Special Agent Utaski was assigned to it. His formal written assignment was dated October 18, 1979, but he had been working on the assignment long before that date.

Within the Criminal Investigation Division of IRS, Special Agent Utaski with his supervisors quickly decided to accept the referral and to begin a "failure to file" returns investigation (T 55). The basis for commencing such an investigation seems very sketchy.

Accordingly to Agent Utaski's direct testimony, in deciding whether to begin a criminal investigation of Weinstein, he "examined the microfilm research" and "could find no record of Mr. Weinstein filing income tax returns for the years 1975, 1976, and 1977" (T 53). He was not asked by the government about the 1974 return and said nothing about it. From cross-examination, it appeared, however, that the 1974 return was in the beginning readily located: "It was filed and we located it. I requested the original return and we received it" (T 66). Thus, although the 1974 return was established as having been filed with Agent Gibson at San Rafael, it moved through proper channels in IRS and was readily found.

With this state of affairs, the 1974 return as filed in the San Rafael office of IRS being actually in the hands of Agent Utaski, it would be supposed that IRS would have immediately begun an intensive inquiry of the San Rafael office and its files to see what happened about the 1975 and 1976 returns, filed in exactly the same way (according to Weinstein) as the 1974 return. However, no such inquiry was then made nor is there before us any denial by Agent Gibson that he received the 1975 and 1976 returns. Instead of an inquiry within IRS, the Criminal Investigation Division—without any basis, other than unspecified "microfilm research," for believing that Weinstein's explanation for his filing the 1975 and 1976 returns was false—launched a

"failure to file" criminal investigation and, incredible as it may seem, included 1974 amongst the returns, the failure to file which was to be investigated (T 54, 57, 72, 76, 80).

The assistance of IRS in the drug prosecution, begun on the day of the drug arrests, then continued and increased. Utaski followed the drug prosecution through telephone contact established with Mueller, discussing with him the then pending indictment, its status and its future. Utaski also exchanged information with Agent Wallace of DEA and talked with him (as well as with Mueller) about the informants in the drug prosecution. According to Utaski, Mueller "wanted the results of our [IRS] investigation, what we had in our files" (T 65). In order to make it appear proper to turn over the tax investigation results to the drug prosecution team, Utaski advised Mueller how to secure a "disclosure order" after they had "talked in terms of a possible disclosure of IRS information to the United States Attorney's Office" (T 60). The "disclosure order" to which the quoted testimony refers is apparently that provided for as to "return or tax payer return information" by 26 U.S.C. § 6103(i). Application for such an order is said to have been first made (presumably by the United States Attorney's office) sometime in November 1978 (T 60).

It might turn out, after an adequate hearing in the Court below, that there is an explanation for all this. With the mistaken procedure followed thus far, no such explanation is in the record and the conduct of IRS seems to have been designed, primarily at least, to serve the purposes of the drug prosecution.

As apparently required by IRS procedure, Utaski began his criminal investigation on October 4, 1978, by telephoning Weinstein and telling him that "there was no record of his filing returns" (T 55). Although Utaski denied (T 55) that he secured any "cooperation" from Weinstein, the denial seems patently false from Utaski's own testimony.

Weinstein made an appointment to meet Utaski (apparently to be on October 17), agreed to bring "certain records" (T 55), and told Utaski about his filing of the 1975 and 1976 returns (T 55); he undertook to bring copies of his 1975 and 1976 returns to the meeting.

Weinstein filed in November 1978 his return for 1977 and the original (apparently) reached the hands of Utaski (T 67); how the filing was made—whether in San Rafael or otherwise—does not appear. Utaski testified (T 67) that as to the 1975 and 1976 returns he could not say that they were not filed, only that he could find no record of their having been filed. It appears now to be conceded that the 1975 and 1976 returns were in fact filed, exactly as Weinstein claimed. The investigation by IRS was not sought to be justified by the Special Agents in the Court below as based on reasonable belief that there was a failure to file; they said they were trying to determine if the returns as filed were correct.

Sometime before October 17, 1978, James MacInnis became attorney, or one of the attorneys, for Weinstein (T 81, 83) and notified Utaski that the meeting with Weinstein for October 17 could not take place at that time (T 83).

On October 30, 1978, Judge Orrick filed an order granting a motion by one or more defendants (not including Weinstein) to suppress as evidence the currency and possibly other items the government intended to use at trial.

The trial of Weinstein and the other defendants on the indictment was set for November 6, 1978. We are told (Reply Brief for Appellant, p. 7) that this was the latest date for commencement of trial under the Speedy Trial Act (18 U.S.C. § 3161).

There was an indictment pre-trial conference on November 2, 1978. The government asked for a continuance of the trial in order to appeal the suppression order. As later explained by Judge Orrick (memorandum opinion quoted in Reply Brief for Appellant, p. 4):

Weinstein objected because he had not been a party to the suppression motions in question, and the evidence that had been suppressed did not pertain to him. He urged the government to sever his case and to proceed to trial or to dismiss with prejudice the charges against him.

On November 6, 1978, the indictment was taken off the trial calendar.

The government then did, on November 14, 1978, dismiss the indictment as against Weinstein and another defendant (Munn), undoubtedly under Fed.R.Crim.P. 48(a). As Judge Orrick has stated it (quoted in Reply Brief for Appellant, p. 4);

On November 14, 1978, the government, upon leave of court, dismissed without prejudice the indictment as to Weinstein and Gordon B. Munn, another defendant who was not directly affected by the suppression order.

It seems to be an accepted fact that the government dismissed as to Weinstein because the government did not have sufficient evidence against him. Special Agent Utaski testified that in November, 1978, Assistant United States Attorney Mueller told him that the dismissal against Weinstein was because the government "just didn't have enough evidence to take to a jury right now" (T 59).

The government did not in fact prosecute any appeal from the suppression of evidence order made by Judge Orrick. What happened to the drug indictment in the District Court as against the three defendants other than Weinstein and Munn cannot be established from the record before us. It appears that counsel for Weinstein told the Court that the United States Attorney had asked for a "disclosure order" in January, 1979, "after he had dismissed the remaining defendants in the drug case" (T 5). The Reply Brief for Appellant (p. 7) states that the "disclosure order" was obtained by the United States Attorney "only after he had dismissed the *entire* indictment" (emphasis supplied). This suggests strongly

that at some time between November 14, 1978, and January 11, 1979, the government dismissed the drug indictment as against the remaining three defendants, presumably under Fed.R.Crim.P. 48(a) by leave of Court. While the government's brief does not state that the drug indictment is still pending as to any defendant, it does state that (p. 3): "Indictments against other defendants remained and the appeal [from Judge Orrick's suppression order] was not mooted." This suggests that as to some defendants the federal drug indictment is still pending. In any event, whatever the status of that indictment, the United States Attorney's Office continued to use IRS in an attempt to supply the deficiencies in its criminal case against Weinstein.

On January 11, 1979, an ex parte order was made and filed by the District Court (not by Judge Orrick) authorizing IRS to disclose to the United States Attorney the results of the IRS investigation. Apparently the order (which could properly be made ex parte) was "quite explicit . . . describing the drug investigation, how the materials which [IRS] would develop would be very important in the drug prosecution . . ." (T 46).

On January 25, 1979, Mr. MacInnis, counsel to Weinstein, met with Utaski and Reynolds (another Special Agent). Presumably Weinstein was present also but the record does not show, one way or the other. As this meeting, MacInnis gave to the IRS Special Agents copies of the 1975 and 1976 tax returns of Weinstein which had been filed with IRS Agent Gibson in San Rafael, at the request of Gibson.

At about this time, IRS decided to transfer Utaski to Cincinnati and to substitute Jackson for him in the Weinstein matter.

On February 27, 1979, Special Agent Jackson turned over to Assistant United States Attorney Mueller everything IRS had on Weinstein which had not already been given to the prosecutors. The material included daily worksheets, reports of interviews, and the like. According to the testimony of Special Agent Jackson, the IRS, on February 27, 1979, made available to the United States Attorney's Office, among other things, the original 1974 return "filed by Mr. Weinstein, photocopies of the 1974, 1975 and 1976 tax returns . . . furnished by Mr. MacInnis and the original 1977 tax return filed by Mr. Weinstein (T 22). This is an explicit recognition that before any question of summonses or their enforcement arose, the IRS knew that Weinstein had filed all his tax returns just as he said he had.

### 3.

The seven IRS summonses which are the subject of this appeal were issued between December 15, 1978, and January 31, 1979. Six were issued by Utaski and the seventh by Jackson, another Special Agent, at the request of Utaski. Such summonses are authorized by 26 U.S.C. § 7602.

At all times in and since November, 1978, and, of course, when the summonses were issued, both Utaski and Jackson knew that the United States Attorney's Office was applying for, or intended to apply for, an order authorizing IRS to turn over to the United States Attorney the results of the IRS investigation for use in a pending non-tax criminal investigation or prosecution.

Since October, 1978, the agents issuing the summonses had had in their possession the original of the 1974 return as filed in San Rafael by Weinstein; since November, 1978, they had had in their possession the original of the 1977 return filed by him; and since at least January 25, 1979, they had had in their possession copies of the 1975 and 1976 returns as filed by him in San Rafael. Three of the summonses involved on this appeal were issued after January 25, 1979. In the face of this showing, it is not possible for me to accept the conclusion that the good faith of the IRS was demonstrated simply because Utaski testified (without counsel for Weinstein being allowed adequate cross-examination) that he could find no record of the filing by Weinstein of returns for 1975 and 1976. If he could not

find such a record, it was not because of any omission by Weinstein but was because of errors of Agent Gibson and others in IRS.

Notices of the issuance of the summonses were given to Weinstein. 26 U.S.C. § 7609(a)(1).

Each summons refers twice to the fact that it is from the "Criminal Investigation Division." While this is accurate, the reason for its use and emphasis is not made to appear.

Weinstein gave notices to the person and to the banks summoned that they should not comply with the summonses. This he was entitled to do. 26 U.S.C. § 7609(b)(2). They did not comply.

#### 4.

On April 24, 1979, the government and Special Agent Jackson filed a verified petition in the District Court to commence a proceeding to enforce the summonses described above. 26 U.S.C. §§ 7402(b), 7604(b). The proceeding was assigned to Judge Conti. To what extent the United States Attorney's Office participated in the decision to commence the enforcement proceeding cannot be determined from the inadequate record made in the District Court.

On June 21, 1979, an order was filed granting an application by Weinstein to intervene in the proceeding. He had a statutory right to intervene. 26 U.S.C. § 7609(b)(1).

On June 26, 1979, Weinstein filed an answer containing defenses which asserted bad faith on the part of IRS in issuing the summonses and which asked for "limited discovery" and "an evidentiary hearing . . . under due process of law in order to meet *his* burden of proof upon his . . . defenses . . . to enforcement of the . . . summons" (emphasis supplied). The principal defense asserted by Weinstein was that the summonses were issued by IRS "for the improper purpose of collecting information and evidence by civil IRS administrative process for use by [the] Department of Justice in a

pending criminal case and/or continuing investigation of the intervenor Weinstein. . . ."

On July 3 and 17, 1979, counsel for Weinstein filed declarations in opposition to the enforcement petition.

On August 7, 1979, an order was filed by Judge Conti requiring that cause be shown on September 7, 1979, why the summonses should not be enforced.

On August 31, 1979, the government filed five declarations in support of the enforcement petition. These were from DEA Agent Wallace, IRS Special Agents Utaski and Jackson, IRS Agent Caramucci, and Assistant United States Attorney Mueller. The failure of the government to submit anything from Agent Gibson at San Rafael is highly significant when it is considered that the government's explanation of the IRS investigation is that Weinstein had failed to file tax returns. Even on this appeal, the government persists in this explanation (Brief, pp. 9, 12), which has been thoroughly discredited and has been long ago abandoned by the Special Agents of IRS who are actually making the investigation.

While the September 7, 1979, hearing was ordered to afford respondents and intervenor Weinstein an opportunity to contest enforcement of the IRS summons, it seems that on September 6, 1979, Weinstein filed a separate application for an evidentiary hearing on the issues and for an "order allowing pre-hearing discovery" (Docket Entries Nos. 31 and 32).

#### 5.

Before continuing with the chronological development of events, a proper understanding of this appeal may be advanced if the chronology is interrupted to notice basic substantive principles governing enforcement of IRS summonses and to notice the procedures which should be followed in determining whether to enforce them. Substantive principles will first be considered.

The governing principles here applicable is that an IRS summons will not be en-

forced where "the material is sought for the improper purpose of obtaining evidence for use in a criminal prosecution...." *Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964).

If a criminal prosecution or criminal investigation by the prosecuting arm of the government is already pending, then any use of IRS summonses to secure information for the purpose of the criminal prosecution or investigation is in bad faith even if a civil tax purpose is also present. If there is no pending criminal prosecution or investigation by the prosecuting arm of the government, then IRS summonses may be enforced, even though *solely* for the purpose of investigating whether criminal conduct has occurred *provided* IRS has not already recommended prosecution to the Department of Justice. This follows from the statement by the Supreme Court that the principle quoted above from *Reisman v. Caplin* was "applicable to the situation of a pending criminal charge, or, at most, of an investigation solely for criminal purposes." *Donaldson v. United States*, 400 U.S. 517, 533, 91 S.Ct. 534, 543, 27 L.Ed.2d 580 (1971). In the same opinion it was also stated (400 U.S. at 536, 91 S.Ct. at 545):

> We hold that under § 7602 an internal revenue summons may be issued in aid of [a criminal] investigation if it is issued in good faith and prior to a recommendation for criminal prosecution.

The reason for the principles just summarized has been explained by the Supreme Court in its most recent opinion on the subject. If a criminal charge is pending, to use an IRS summons to secure information in aid of the prosecution would improperly extend the scope of discovery provided by the Federal Rules of Criminal Procedure. If the prosecuting arm is making an investigation into possible criminal conduct, to use an IRS summons to secure information in aid of the investigation would improperly trespass on the traditional functions of the grand jury. And where no criminal charge is pending nor any criminal investigation by the prosecuting arm, to deny enforcement of IRS summonses after a recommendation of prosecution by IRS is a "prophylactic" to protect the public policy as just set out. This was the explanation in *United States v. La Salle National Bank*, 437 U.S. 298, 312–313, 98 S.Ct. 2357, 2365, 57 L.Ed.2d 221 (1978):

> Nothing in § 7602 or its legislative history suggests that Congress intended the summons authority to broaden the Justice Department's right of criminal litigation discovery or to infringe on the role of the grand jury as a principal tool of criminal accusation.... The likelihood that discovery would be broadened or the role of the grand jury infringed is substantial if post-referral use of the summons authority were permitted.... Effective use of information to determine civil liability would inevitably result in criminal discovery. The prophylactic restraint on the use of the summons effectively safeguards the two policy interests while encouraging maximum interagency cooperation.

Thus, the presence of a civil tax purpose by IRS does not show "good faith" by IRS so as to warrant enforcement of an IRS administrative summons if (a) there is already pending a criminal charge or a criminal investigation by the prosecuting arm of the government *or* (b) the IRS has already recommended prosecution of a tax related criminal charge. As carefully explained by the Supreme Court in *La Salle* 437 U.S. at 311–13, 98 S.Ct. at 2365:

> We recognize, of course, that even upon recommendation to the Justice Department, the civil and criminal elements do not separate completely. The Government does not sacrifice its interest in unpaid taxes just because a criminal prosecution begins. Logically, then, the IRS could use its summons authority under § 7602 to uncover information about the tax liability created by a fraud regardless of the status of the criminal case. But the rule forbidding such is a prophylactic

intended to safeguard ... policy interests.

*La Salle* dealt with an investigation by IRS of a tax related offense before any criminal charge was pending and before any criminal investigation by the prosecuting arm of the government. The "policy interests" are far stronger in the case at bar and the situation here is far clearer for denial of enforcement of the IRS summonses because (a) a criminal charge and a criminal investigation by the prosecuting arm of the government—the United States Attorney's Office—were already pending before the summonses here were issued; (b) the criminal charge and investigation dealt with an offense (narcotics) not directly related to taxes; and (c) it was the prosecuting arm of the government which brought in the IRS.

### 6.

Where, as here, the taxpayer has asked for discovery and has also asked for an evidentiary hearing, the procedure to be followed in respect of discovery in the summons enforcement proceeding has been pointed out by this Court in *United States v. Church of Scientology, etc.*, 520 F.2d 818 (1975).

Weinstein has a right to contest the IRS summonses on the ground that "the material is sought" for an "improper purpose" (375 U.S. at 449, 84 S.Ct. at 513). It would be an "improper purpose" if—as seems to be beyond dispute—IRS proposes to make the information available to the United States Attorney's Office. This was made crystal clear in *La Salle* when the Supreme Court declared (437 U.S. at 317, 98 S.Ct. at 2368): "... the good-faith standard will not permit the IRS to become an information-gathering agency for other departments, including the Department of Justice, regardless of the status of criminal cases." Of course, it is no answer to say that there was a "disclosure order" here, dated January 11, 1979, under 26 U.S.C. § 6103(i); such an order necessarily relates to "return information" already in the files of IRS and does not make proper "information-gathering" in the future which would otherwise be for an "improper purpose."

Weinstein also has a right to an adversary hearing where he may present evidence to show that the summonses were issued for an "improper purpose," as to which it is recognized that Weinstein has the burden of proof. The Supreme Court has declared that in a summons enforcement proceeding the rights of a taxpayer, such as Weinstein, must be "protected" and "an adversary hearing, if requested" must be "made available" (400 U.S. at 529, 91 S.Ct. at 541).

The hearing with which the *Scientology* opinion was concerned was not, however, the "adversary hearing" to which Weinstein was entitled on the issue of "improper purpose" raised by his answer. The hearing ordered in *Scientology* was simply a *"limited* evidentiary hearing to determine whether further inquiry into the Service's purposes by way of discovery [was] warranted" (520 F.2d at 825; emphasis in original).

The discovery procedure approved in *Scientology* for summons enforcement proceedings was that discovery should be the exception; that conclusory averments of an improper purpose are not sufficient for a grant of discovery; that some evidence should be introduced by the opponent of enforcement; that this should be done at a limited evidentiary hearing where it would be appropriate for the opponent to cross-examine the agent issuing the summons; and that if, after the limited hearing, it appeared to the Court that a substantial question existed as to the validity of the IRS purpose, discovery should be granted. While not expressly articulated in this Court's opinion, it seems evident that, whether discovery be granted or not, an adversary hearing must still be afforded at which the opponent is given an opportunity to present evidence of the claimed "improper purpose" in the issuance of the summonses.

### 7.

We are told (Brief for Appellant, p. 5) that on the return of the order to show

cause on September 7, 1979, the discussion between the District Court and counsel was not about enforcement of the summonses but was about the "procedure to be followed" in the enforcement proceeding. Counsel for Weinstein insisted that he was entitled to "a complete evidentiary hearing, following completion of discovery" (Brief for Appellant, p. 6).

After the procedural conference on September 7, 1979, and on the same day, Judge Conti filed an order with memorandum opinion. This indicated that the District Judge had studied the relevant precedents, including *Scientology*, understood their principles, and accepted them. His opinion states (citing *La Salle*) that "the good faith standard does not permit the IRS to exercise its summons authority" for any purpose "to gather evidence for use in a non-tax criminal case currently pending against" Weinstein. He had read the "affidavits" (declarations) filed by the parties. He referred to the requirement "that an adversary hearing into the enforceability of an IRS summons must, if requested, be made available." He referred to *Scientology* and stated that the "affidavits" for Weinstein raised "sufficiently serious questions to merit a hearing" and he fixed a "further hearing" for September 21, 1979 at 1:30 p. m. (the time may turn out to be of some significance). The opinion stated: "The hearing will be limited to an examination of the persons who have offered affidavits in support of the petition. The Court will then determine on the basis of its observations whether further inquiry into the Service's purposes is warranted." It will be recognized that this is a partial quotation from, and a paraphrase of, page 825 of the *Scientology* opinion dealing with what that opinion there referred to as "a pre-discovery evidentiary hearing." It seems evident that Judge Conti intended the September 21 hearing to be "a pre-discovery evidentiary hearing," the "*limited* evidentiary hearing to determine whether further inquiry into the Service's purposes by way of discovery is warranted" described on page

825 of the *Scientology* opinion (emphasis in original). This is confirmed by the specific cite in Judge Conti's opinion to page 825 of *Scientology*. The September 21 hearing was to be the "limited" hearing to determine whether discovery should be granted and was not to be the "adversary hearing" to which Weinstein was entitled and at which he had a right to "challenge the summons on any appropriate ground" including that the summons was issued "for the improper purpose of obtaining evidence for use in a criminal prosecution" (375 U.S. at 449, 84 S.Ct. at 513).

If the intention of Judge Conti in his September 7 opinion was as indicated in his opinion, that intention radically changed between September 7 and September 21, 1979.

8.

There was a hearing on September 21, 1979, beginning at 1:30 p. m. The transcript suggests that there were time pressures on the District Judge, possibly because it may have been at a luncheon recess of a busy District Court. At the very beginning, while stating appearances to the Reporter, counsel for Weinstein asked for "a moment to get unpacked." The Court replied: "Well, don't unpack too much." (T. 3). The Court later stated: "I am not going to have a big, protracted hearing." (T. 8). The Court still later addressed counsel to Weinstein: "Well, let's move on. I don't want to spend all day on this." (T. 42–43).

In any event, counsel for Weinstein told the Court (T. 3–7) that if necessary Weinstein, without any discovery, was prepared to go forward with a hearing on the merits as to whether the summonses should be enforced or not; that Weinstein would concede that the government on the papers had made a prima facie case for enforcement; and that Weinstein was prepared to present his own testimony and that of the five declarants for the government (four agents and the Assistant United States Attorney) to sustain his burden of proof of an improper purpose in the issuance of the summonses.

The Court announced (T. 7) that the purpose of the hearing was "to find out about the enforceability of the summons and to obtain enforcement of the summons." The Court declined to permit Weinstein to present any evidence, except in the cross-examination of "the agent, who issued the summons" (T. 7; also see T. 8), mistakenly identified by the Court as Jackson (who in fact issued only one of the seven summonses involved). The Court directed the government to put Jackson on the stand, stating that when the examination of that agent was ended, if the Court had a substantial question about the IRS motives, there would be an adjournment of the hearing and limited discovery would be allowed, but that if "no such questions existed" then "the matter is at an end" and "there is no reason for any further hearing" (T. 8). Thus, if the government could satisfy the Court by the testimony of the agent (or agents) who issued the summonses, those summonses would be enforced without giving Weinstein any opportunity to present any evidence to show an improper purpose for issuance of the summonses (T. 7, 8). While the Court cited *Scientology* as precedent, a reading shows that *Scientology* intended no such thing.

In vain, counsel for Weinstein pointed out that Jackson came late to the scene and followed Utaski, that the evidence should be taken chronologically, that Weinstein should be allowed to present his evidence, that he would like to start with his own testimony, that Caramucci and DEA Agent Wallace should come next, and that Weinstein wanted to show how from the beginning the drug case prosecution was using IRS for improper gathering of information (T. 8–10). The Court stated that it was not interested in "the drug part" or in "what happened to Mr. Weinstein" but was solely interested in "the motivation of the IRS." The District Court mistakenly believed, as the majority here now believes, that if there was any civil tax purpose for the issuance of an IRS summons, then a separate purpose of IRS to aid a pending criminal investigation or criminal prosecution by the United States Attorney would not prevent the enforcement by the Courts of an IRS summons. Such a belief can only be held by ignoring the plain statement of the Supreme Court in *La Salle*: "The Government does not sacrifice its interest in unpaid taxes just because a criminal prosecution begins. Logically, then, the IRS could use its summons authority under § 7602 to uncover information about the tax liability created by a fraud regardless of the status of the criminal case. But *the rule forbidding such* is a prophylactic intended to safeguard ... policy interests" (437 U.S. at 311–12, 98 S.Ct. at 2365; emphasis supplied).

By the time of the hearing on September 21, 1979, all pretense had been dropped by IRS that the issuance of the summonses was related in some way to a failure by Weinstein to file tax returns. Special Agent Jackson, the lead-off witness for the government, conceded that all of the tax returns were filed by Weinstein and attempted to justify the summonses on a wholly *different* ground—that IRS now wanted to verify the correctness of the returns admittedly filed. He described the purpose of the investigation as follows:

... to determine the accuracy of those returns (T. 14);

To determine if the returns, *as filed by Mr. Weinstein*, are correct. (T. 14–15; emphasis supplied).

After direct and cross-examination of Jackson, the government was permitted to call Special Agent Utaski. After his direct examination, counsel for Weinstein was permitted to cross-examine for several minutes. Then the Court interrupted to say (T. 86): "... We are going way far afield. I want to know if there is any bad faith or if there is any nexus between the two. I haven't found any so far." This last observation seems to be particularly unfair since the Court had refused to permit Weinstein to present any evidence (T. 7, 8), limiting him to the cross-examination of the rela-

tively minor IRS agent directed to be first called by the government and cutting off and refusing any meaningful cross-examination of the chief IRS agent.

Counsel for Weinstein asked to be allowed to finish his cross-examination of Utaski. This was refused (T. 86). The Court then stopped the proceeding and without further ado announced its decision (T. 86):

> I am going to cut the hearing off at this particular juncture. The purpose of the hearing is to sift out the evidence, if there is any, of harassment or improper purpose that can be substantiated to avoid dilatory or discovery matters and to see whether or not the purpose of the summons were to assist the government, and we have had both the people on the stand that have issued the summons and I find no bad faith on their part, nor any purpose to assist the government in the drug case and thereby, the court orders the government's petition for enforcement of summons is granted.

If any decision was called for so precipitously, it was a decision to deny enforcement of the summonses since it appeared beyond dispute that the IRS, whatever its interest in Weinstein's civil tax liability, was also gathering information for the United States Attorney. Certainly there was not the slightest justification for shutting off the cross-examination, denying Weinstein the right to present any evidence, and abruptly halting the hearing.

On September 24, 1979, Judge Conti filed an order enforcing the seven summonses involved. There was no opinion but there was a finding that the IRS "was not acting as an information-gathering agency for the Department of Justice." This finding is contrary to such evidence as there was, and after Weinstein had been denied, not only discovery, but the right to present evidence. As an indication of the information-gathering relationship between IRS and the United States Attorney, counsel to Weinstein pointed out to Judge Conti (without any contradiction from the government) that, in order to secure an IRS "disclosure order" from the District Court (not Judge Conti nor Judge Orrick), the Assistant United States Attorney had represented to the District Court "that it was essential to the United States Department of Justice to have access to all of this civil tax information so-called that were to be gathered [by IRS] on Mr. Weinstein for the express purpose of using it in a continuing investigation or a present case against Mr. Weinstein" (T. 6). Even though Judge Conti cut off any adequate development of the facts, this is itself a showing that the United States Attorney's office was using IRS wrongly to broaden the discovery permitted under the Federal Rules of Criminal Procedure as to a pending indictment and was wrongly invading the traditional function of a grand jury as to a criminal investigation.

9.

Weinstein had at all times protested the dismissal without prejudice of the indictment as to him. A motion that this dismissal be with prejudice was argued to Judge Orrick on October 2, 1979.

On October 4, 1979, the IRS commenced a second proceeding to enforce 6 more of the 36 summonses issued through June 1979 in the Weinstein matter. As to this second enforcement effort, the same procedure had been followed as in the first. The second proceeding was also assigned to Judge Conti.

On October 10, 1979, a notice of appeal was filed for Weinstein from the September 24, 1979, order enforcing the summonses. At the same time there was a motion to Judge Conti for a stay pending the appeal. On October 30, 1979, Judge Conti denied the motion for a stay pending appeal.

On November 16, 1979, a motion panel of this Court (Choy and Kennedy, C. JJ.) granted a motion by Weinstein for a stay pending appeal.

Weinstein moved in the District Court for a stay of the second enforcement proceed-

ing. Judge Conti took this motion under advisement on November 30, 1979, and so far as appears no decision has been filed.

We are told (Reply Brief for Appellant, p. 5) that on January 8, 1980, an indictment was returned in a California state court against Weinstein and others (including the other defendants indicted in the Court below on August 16, 1978) on the same drug charges as made in the federal indictment. Why the federal indictment was dropped (if it has been) and what the connection is between the federal and state indictments does not appear. The logical assumption is that the federal prosecutors worked with the state prosecutors and made available to the latter the information gathered for the federal prosecution by the IRS.

On January 11, 1980, Judge Orrick denied the motion by Weinstein that the dismissal of the federal indictment as to him be with prejudice; he announced his decision in open court. On January 18, 1980, a memorandum opinion and order were filed by Judge Orrick, embodying and explaining his decision. According to the Reply Brief for Appellant (p. 5), the opinion

> ... acknowledges the substantiality of the due-process and speedy trial issues presented ... rejects the government's contentions of non-justiciability, ... specifically refers and defers to the pendency of the appeal in this case as being where any evidence of institutional bad faith vis-a-vis the IRS and the drug-case prosecutor must be adjudicated, and holds that on the record before him he finds no grounds upon which to exercise his discretion to order the government's withoutprejudice dismissal of the indictment converted to a with-prejudice dismissal.

Appellant moved in this Court to supplement the record on this appeal by adding the transcript of the January 11, 1980, hearing before Judge Orrick and by adding the opinion and order of January 18, 1980 of Judge Orrick. The motion was denied by Judge Sneed by order filed February 8, 1980, but it was provided that "the items

shall be lodged with the Court for such consideration as the panel which hears the case on its merits deems appropriate."

10.

It is difficult to have confidence in the presentation of this matter for the government and difficult to avoid an impression that the true state of affairs was never revealed.

There is no mention of Agent Gibson in the government's brief on this appeal nor, of course, any explanation for the failure to submit anything from him. We know that Agent Gibson duly received at San Rafael the 1974 return; the original was easily obtained in October 1978 by Utaski. We know that the 1975 and 1976 original returns were filed at San Rafael in the same way as the 1974 return. What did Gibson do with them? Where are they now? Is there in fact no IRS record of their having been filed? If not, why not? The evasions of the government and the procedure followed in the District Court prevented these questions from being answered.

There is no explanation by the government for its dismissal of the indictment against Weinstein, nor any effort to contradict the sworn testimony of Special Agent Utaski that, according to the Assistant United States Attorney in charge of the prosecution, dismissal was required because there was not enough evidence against Weinstein (T. 59). Yet, the government makes bold to tell this Court in its brief:

> Here, the Internal Revenue Service was dealing with an apparent drug dealer/attorney who had, allegedly, failed to file income tax returns for several years and lied to the first investigating agent. (p. 6)

> ... the Drug Enforcement Administration ... had apprehended the taxpayer with more than 500 pounds of hashish .... (p. 8)

> When Revenue Agent Caramucci determined that taxpayer, an apparent drug dealer, had made false statements to him

and had failed to file income tax returns for the years 1975, 1976, and 1977, he referred the investigation as a potential fraud case. (p. 9)

Failure to file returns and making false statements to agents are recognized badges of tax fraud. (p. 12)

Not only does there seem to be no justification for the emphasis on drug offenses by Weinstein but when the government's brief was filed, it had long been established—despite the restrictions in the District Court—that Weinstein had in fact filed his tax returns and that his statements to the IRS agents were true. The IRS agents, at the inadequate hearing below, had so conceded.

The conduct of the government in contending that Weinstein declined to present evidence in the District Court is also questionable.

The government represents in its brief (p. 4):

When the District Court became satisfied that taxpayer was not able to elicit any evidence to support his claims from the agents, it asked taxpayer if he had any other evidence to present. Counsel declined to present any evidence . . . .

and again (p. 7):

Before terminating the evidentiary hearing, the District Court asked the taxpayer's counsel if he had any further evidence to present. Counsel declined to present any other evidence . . . .

It is true that the transcript of the September 21, 1979, hearing shows a question by the District Court (T. 86): "Have you got another witness so we can proceed?" From this question, and what immediately preceded and followed it, there is no way to determine to whom the question was addressed. In the context of the hearing from its commencement, however, the question must have been addressed to *government* counsel, as appellant's Reply Brief (p. 12) insists was the case. The District Court had in the beginning directed that the *government* call as witnesses the agent (or

agents) who issued the summonses (T. 7, 8). Counsel for Weinstein had asked to be allowed to present evidence first, had indicated the witnesses he proposed to call (including Weinstein himself), and the order in which he proposed to call them (T. 3–7). The District Court denied Weinstein the right to present evidence, limiting his counsel to cross-examination of the agent (or agents) directed to be called by the government, and later denying an adequate cross-examination of the more important of the two agents called by the government (T. 7, 8, 86). The Court below early ruled (T. 8):

THE COURT: I am going to have the agent that issued the summons testify and listen to him. And if I am satisfied after that, then there is no reason for any further hearing.

Having thus early denied Weinstein the right to present any evidence, it can scarcely be supposed that the Court below would address to counsel for Weinstein a question whether other witnesses were available.

### 11.

The procedure followed below as to discovery was contrary to that specified in *Scientology* and contrary to the District Court's own order filed September 7, 1979. It was an abuse of discretion, in my view, to deny any discovery to appellant. The circumstances were unusual, to say the least, and strongly suggested the necessity of a thorough exploration.

As a matter of substantive law, the District Court committed error in denying appellant his right to "challenge the summons" on the "appropriate ground" that the "material was sought for the improper purpose of obtaining evidence for use in a criminal prosecution . . . ." (375 U.S. at 449, 84 S.Ct. at 513). Not quite a year ago, in what seems to have been its latest repetition of the established principle, the Supreme Court declared that a person in the position of Weinstein "is entitled to challenge the issuance of the summons in an adversary proceeding in federal court prior

to enforcement, and may assert appropriate defenses." *United States v. Euge*, 444 U.S. 707, 719, 100 S.Ct. 874, 882, 63 L.Ed.2d 141 (February 20, 1980).

To order enforcement of the summonses after an arbitrary denial of elementary due process, as I see it, was a grave mistake.

It seems especially unfair to justify enforcement on the ground that Weinstein failed to meet his burden of proof when he was denied in the District Court his right to present evidence.

I would reverse the order appealed from and would remand with instructions to grant appropriate discovery to appellant, to afford appellant an adequate adversary hearing, and to determine on a more complete record whether the summonses should be enforced.